**Theodore R. BERGSTROM, Plaintiff,**

v.

**SEARS, ROEBUCK AND COMPANY and Cardinal American Corporation, Defendants.**

**Civ. No. 3–75–248.**

United States District Court,
D. Minnesota,
Third Division.

Feb. 25, 1982.

---

Lawrence C. Brown and Steven C. Schroer, Faegre & Benson and Douglas J. Williams and John D. Gould, Merchant, Gould, Smith, Edell, Welter & Schmidt, P. A., Minneapolis, Minn., for plaintiff.

Thomas V. Koykka, Arter & Hadden, Cleveland, Ohio, and Charles E. Steffey, Schroeder, Siegfried, Ryan, Vidas, Steffey & Arrett, Minneapolis, Minn., for defendant Cardinal American Corp.

## MEMORANDUM INCORPORATING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

MacLAUGHLIN, District Judge.

This action for patent infringement is before the Court for the third time. The matter first came before the Court for a determination of the issue of whether the patent involved, United States Design Patent No. 228,728, was invalid pursuant to 35 U.S.C. § 102(b). The Court held that the patent was not invalid and dismissed the defendants' counterclaim for declaratory judgment of invalidity. *Bergstrom v.* *Sears, Roebuck & Co.*, 457 F.Supp. 213 (D.Minn.1978), aff'd, 599 F.2d 62 (8th Cir. 1979). In July, 1980, after a full trial on the merits, the Court held that the plaintiff's patent was valid and infringed by the defendants. The Court granted an injunction and awarded the plaintiff $1,455,194.50 in damages against defendants Sears, Roebuck & Co. and Cardinal American Corp. (Cardinal). *Bergstrom v. Sears, Roebuck & Co.*, 496 F.Supp. 476, 207 U.S.P.Q. 481 (D.Minn.1980).

The defendants initiated an appeal of the latter decision to the United States Court of Appeals for the Eighth Circuit. Sears and Cardinal retained new counsel to conduct the appeal. Cardinal also retained yet another lawyer to conduct negotiations regarding a settlement of the litigation. The plaintiff contends that a settlement was reached and that Cardinal subsequently repudiated the settlement. The plaintiff applied to the Court of Appeals for a stay of the appeal and for a remand to the District Court. The motion was granted by the Court of Appeals on January 14, 1981.

The matter is now before the Court on a limited remand from the Court of Appeals. The Order of Remand directs this Court "to receive additional testimony or other evidence on the issue of whether a settlement was reached and to pass on that issue." In the judgment of the Court there is strong evidence which clearly and convincingly establishes that an agreement of settlement was reached between the parties. The following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### I. CHRONOLOGY OF EVENTS

The plaintiff in this case is Theodore Bergstrom. During the trial on the merits and while the appeal was pending, he was represented by John D. Gould and Douglas J. Williams of the Minneapolis law firm of Merchant, Gould, Smith, Edell, Welter & Schmidt.

The defense and appeal of this lawsuit was handled primarily by Cardinal. Cardi-

nal's operations are based in Cleveland, Ohio. S. Darwin Noll is the president, chairman of the board, and owner of approximately 96 percent of the capital stock of Cardinal. The Chicago law firm of Allegretti, Newitt, Witcoff and McAndrews acted as trial counsel for Cardinal. The Allegretti law firm began the work of writing the brief on appeal, but before completion Cardinal decided to change attorneys and retained the Cleveland law firm of Arter & Hadden. Principal responsibility for the appeal was assumed by Thomas Koykka. While the briefs on appeal were being prepared, Cardinal also retained William J. Kraus of the Cleveland law firm of Garofoli, Kraus, Hill, Roth & Bartunek to explore the possibilities of negotiating a settlement of the lawsuit.

Kraus had represented Cardinal in connection with other matters on two occasions prior to becoming involved in this lawsuit. Kraus was first consulted by Noll with regard to a possible settlement of this lawsuit in June, 1979, a year prior to the trial. Kraus met again with Noll after the judgment was entered. In September, 1980, Kraus traveled with Alan D. Gross, Cardinal's corporate counsel, to the Allegretti law firm in Chicago. At this time, the Allegretti firm was writing the brief for the appeal. Dennis Allegretti and Jon O. Nelson of that firm informed Kraus of their opinion that a settlement in the range of $750,000 would be good for Cardinal. In a letter confirming the discussion, Nelson wrote:

> Additional factors which may assist in settlement negotiations include the following:
>
> 1. Bergstrom desires to transfer title to the patent. If such a transfer is effected, the consideration should be capital gain, a significant tax benefit to Bergstrom.

> 2. Any consideration for a capital gain transfer could be spread over a number of years, secured perhaps by a note or other collateral. As such, Bergstrom, being a cash basis taxpayer, could spread the tax benefits over a number of years. This would be beneficial to Cardinal's cash flow condition also.

Kraus soon thereafter met again with Darwin Noll and was authorized by Noll to explore the possibilities of settlement with Bergstrom's attorneys.[1] The concept to be explored was a sale of the patent by Bergstrom to Cardinal. It was believed that this would permit Bergstrom to obtain favorable capital gains treatment for tax purposes and thus make it possible for Cardinal to make a much smaller payment than the amount of the judgment while still giving Bergstrom the same net in after tax dollars.

Kraus called John Gould on September 21, 1980, to arrange a meeting in Minneapolis to discuss the possibility of settlement. Since Kraus was previously unknown to Bergstrom and his attorneys, Gould's associate, Douglas Williams, made inquiry of Cardinal about Kraus. Williams called Robert G. Markey, who was a member of Cardinal's board of directors and a partner in Arter & Hadden, which had recently been retained to conduct the appeal. Markey confirmed that Kraus had been retained to explore settlement. Williams also spoke with Thomas Koykka about Kraus' role.

On October 7, 1980, Kraus met with Williams and Gould in Minneapolis. Kraus told Williams and Gould that the meeting was to be exploratory and that he had no authority at that time to settle the case. Kraus broached $500,000 as an amount for the settlement, but no firm understandings were reached. That night Kraus reported to Darwin Noll and Alan Gross the results of the meeting. On October 9, 1980, Kraus had an extended telephone conversation with Gould and Williams. Gould became

---

1. There is convincing evidence that Noll completely controlled all significant decisions of Cardinal. As previously stated, he was the chief executive officer and owned 96 percent of the stock of the corporation. Kraus testified that Noll told him "I own the company" and "I don't need any directors [to settle the case]." Kraus Dep. at 268. Kraus further testified, "... Darwin made it clear and manifest, he ran the company and he owned the company, and he would do what he wanted to do." Kraus Dep. at 270.

upset during the call and did not participate in the negotiations after that point. During the conversation, Kraus and Williams reached an agreement on a proposal to recommend to their respective clients. The general terms of the proposal involved a payment of $750,000 by Cardinal to Bergstrom, with $200,000 down and four additional installments of $137,500. In return, Bergstrom would transfer the patent to Cardinal and dismiss the lawsuit. If Bergstrom did not receive favorable capital gains treatment on the transfer, then Cardinal would pay an additional $200,000 at a later date.

Between October 9 and October 20, Kraus held discussions with Noll, Koykka, Markey, and other Cardinal representatives regarding the proposal of settlement. On October 19, 1980, Kraus went to the home of George Grabner, a director of Cardinal, to discuss the proposal. As a result of this meeting, Grabner arranged for Noll and the directors and other advisers of Cardinal to meet the next day, October 20, at the Cleveland Athletic Club to discuss and evaluate the proposal. Present at the meeting were Noll, Grabner, Markey, and Paul A. Miller, four of the five directors of Cardinal. Also present were Kraus, corporate counsel Alan Gross, and William McCoy, a Cleveland patent attorney who had been consulted by Noll in connection with the litigation. Kraus discussed the $750,000 proposal to settle at some length. Some opposition was expressed to the proposed term whereby Cardinal would effectively "guarantee" favorable capital gains treatment for Bergstrom. The meeting ended without approval of the proposal.

After the meeting, Noll, Miller and Grabner, three of the five directors of Cardinal, decided to meet over breakfast the next morning, October 21, to discuss possibilities for settling the case. After this meeting, Noll called Kraus and said that he, Noll, along with Miller and Grabner had decided that a new and different proposal to settle should be given by Kraus to Bergstrom. Noll told Kraus that the offer had approval of the board of directors. The fundamental terms of the offer Noll dictated to Kraus were that Cardinal would make an initial payment of $500,000 to Bergstrom to purchase the patent plus one dollar per unit sold over the life of the patent, in installments, with guaranteed minimum sales of 300,000 units. However, Cardinal would not give any guarantee of favorable tax treatment to Bergstrom.

That afternoon, Kraus called Williams and communicated the terms of the offer as he had been instructed to do. The offer was conditioned on Cardinal being assured of the feasibility of certain technical aspects of the offer by its accounting firm, Arthur Andersen & Co. Between October 21 and 23, 1980, Kraus met with James Thailing of Arthur Andersen and tax attorney Dick Katcher regarding the technical aspects of the offer. Kraus received sufficient assurances from these people to go forward with the deal. Meanwhile, Williams consulted with Bergstrom regarding the offer. Bergstrom indicated that he would accept the offer if the minimum guarantee would be raised from $300,000 to $320,000. This was communicated to Kraus and from Kraus to Noll. Noll approved the increase. On October 23, 1980, before leaving on a trip to the Middle East, Noll told Kraus that when the details were cleared with Arthur Andersen, the deal should be made with Williams. Among the group with whom Noll made the trip to the Middle East were Grabner and Noll's brother, Sanford Noll.

On October 24, 1980, Williams and Kraus again spoke over the telephone. Williams informed Kraus that Bergstrom accepted Cardinal's offer. Kraus replied, "We have a deal."[2] They agreed that Williams would

---

2. Kraus, after testifying to the details of the new proposal of settlement submitted to him by Noll on October 21, stated as follows about the negotiations which ensued:

 And he [Noll] said "The deal you talked about with Gould and Williams is out. This is the deal. They will either take it or else.

And that is the deal that you have got to sell them on."
 . . . .
 So I said "All right. Let me see what I can do to sell it."
 So I called up Doug Williams [attorney for Bergstrom] and I tried it out on him. And he

was very unhappy about having to go back and try to sell this kind of a deal.

Q. Before we talk about your discussion with Williams, have you told us everything that you can recollect about your conversation with Mr. Noll on the 21st?

....

A. He instructed me, directed me and authorized me to make that proposal to Mr. Williams for Mr. Bergstrom, the lawyer for Mr. Bergstrom, yes.

Q. You then did make that proposal, did you not?

A. I did make that proposal.

....

A. .... Then I called Darwin Noll and I reported back to him as to what had transpired.

And on the 22nd Darwin called me up and he said "Look, there is one other thing."

He said "I want Arthur Andersen—there is a Mr. Thailing," .... And he said "I want him to certify my statement."

And he said "Unless he certifies the statement I can't make the deal."

So he said "You will have to—as part of the settlement, you will have to straighten that out with him."

So I called up Mr. Thailing.

Q. When did that take place?

A. On the 22nd. And I called Darwin back and told him that this has become very ultra-technical. He doesn't want to certify.

....

On the following day, on the 23rd, I called Darwin again, told him what the problem was, and told him that I had set up a meeting with Jim Thailing, at which I would work out this matter of the certification of the statement. And in the meeting with Jim Thailing I worked out the matter of the certification of the statement.

....

A. On that same date, the 23rd, then, I called Doug Williams. Worked out a few details on the language of this proposal which Darwin Noll had made, which he now had agreed to accept.

And I then called up Darwin, and I said "We are set with Arthur Andersen."

And at that point on the 23rd he said to me "If we are set with Arthur Andersen, you make the deal with Doug Williams."

And that was on the 23rd.

....

And I put in a phone call to Doug Williams. And I wasn't able to reach him on the 23rd.

But on the 24th I called him. I think that he was in LA. He was out of town. He called me back. That is why I hadn't been able to reach him on the 23rd.

I said to him "We have a deal."

And the note on my telephone conversation is "A deal is made."

That is the Note. [Then marked as Exhibit 23].

Kraus Dep. 276–280. Exhibit 23 is reproduced in full and incorporated in this Memorandum.

FILE No.

To:

M. Doug Williams Phone No. 612/336 6351

Of:

| | | Re: |
|---|---|---|
| TELEPHONED | ✓ | |
| CAME IN | | |
| RETURNED CALL | | |
| PLEASE RETURN CALL | ✓ | Deal is Made! |
| WILL CALL AGAIN | | |
| WANTS TO SEE YOU | | |
| DISCUSS WITH ME | | |
| URGENT | | |

MESSAGE

While you were out

Date: 10/24 Time: 235 By: ☐ Read

#48 TELEPHONE MESSAGE ALL-STATE LEGAL SUPPLY CO., MOUNTAINSIDE N J 07092

prepare a draft letter agreement memorializing the terms of the oral agreement. At this point, there was a full meeting of the minds of the parties as to the essential terms of the agreement.

In a letter dated October 28, 1980, Cecil Schmidt, a partner in Williams' law firm, prepared a letter setting forth in detail the terms of the oral settlement agreement. Schmidt also prepared a document entitled "Consent to Dispose of Present Inventory." When he received the letter, Kraus circulated it to accountant Thailing, tax attorney Katcher, patent attorney McCoy, and attorney Gross. Kraus received comments and proposed language changes from Gross and others. In the copy of Kraus' letter on which Gross (who, it should be recalled, was corporate counsel for Cardinal) marked his comments, Gross underscored the phrase "acceptance has been confirmed by brief letter." Very significantly, in spite of the unequivocal language in the Schmidt letter indicating that a firm agreement of settlement had been reached, neither Gross nor Kraus attempted to disavow the contract, nor did Gross question Kraus' authority to bind Cardinal to the agreement.[3]

On November 3, 1980, Kraus prepared new and final drafts of the settlement agreement, making only technical and routine language changes from Schmidt's letter. The documents drafted by Kraus, Plaintiff's Exhibits 30, 31, and 32, contain the terms of the settlement agreement orally agreed upon between the parties. About these documents Kraus testified:

Q. . . . . Just so I understand completely what the three documents marked as 30, 31 and 32 are, would I be correct in understanding that the terms that you drafted into these three exhibits were the terms of the agreement that you had reached with Doug Williams?

A. Yes.

. . . . .

Q. And they also reflected any changes in language which you had discussed with the people you have referred to, Mr. Thailing, Mr. McCoy, Mr. Katcher, Mr. Gross?

A. With all the people that Darwin Noll had suggested I consult with, whose approval I require in order to get the language, you know, in order, in shape.

Q. So these three documents then constitute the complete and final understanding of the terms that had been agreed to?

A. Yes. Except that I have not had an opportunity to present them to Doug Williams and get his final approval of these particular documents which—

Q. Of the language changes he made?

A. Of the language changes which, in substance, reflect the deal that had been agreed upon.

Kraus Dep. 298–99. The Court finds this testimony to be credible.

Sometime after Noll returned from his trip to the Middle East on November 2, 1980, he received and reviewed Koykka's brief on the appeal. He met with Kraus on Tuesday, November 4, 1980, and again on November 5, 1980. Noll's brother, Sanford Noll, accompanied Noll in the meetings with Kraus. During the second meeting, Noll informed Kraus that he did not intend to perform his part of the settlement. Car-

---

**3.** Kraus testified as follows as to the role of Gross in the settlement negotiations:

"But at the same time I knew that Alan Gross was also keeping [Noll] informed. And I was in almost daily communication with Alan Gross, so that he knew everything from me that was going on, because that had been the original instructions which I received from Darwin. 'Work through Alan and keep him informed as to everything that is going on.'

So Alan knew everything that was going on."

Kraus Dep. at 234.

dinal has continued to repudiate the settlement since that day.

## II. CREDIBILITY OF WITNESSES

The evidence in this case involves a great deal of conflicting testimony, particularly between the testimony of Noll and Kraus. After careful evaluation, the Court has determined that the testimony of Kraus more accurately reflects the true course of events in this case than does the testimony of others which conflicts with Kraus' testimony.

The Court realizes that it did not have the opportunity to view the demeanor of Kraus. However, the appearance of lack of credibility of other witnesses, the obvious change of "story" of some of those witnesses, and the extrinsic evidence which corroborates Kraus' deposition testimony makes his testimony highly credible. The Schmidt

letter precisely corresponds to Kraus' testimony of the oral agreement reached between him and Williams. The affidavit and testimony of Williams also corresponds with Kraus' testimony. Two letters authored by Robert Markey, a partner in the Arter & Hadden law firm and a member of Cardinal's board of directors, also bolster Kraus' testimony at the expense of the credibility of Noll, Miller and Grabner. Markey's letters confirm that a decision had been made at the October 21, 1980, breakfast meeting between Noll, Miller and Grabner to make an offer to settle the lawsuit.[4] Although Cardinal called Markey to testify at the trial, it made no attempt to have him explain the letters.[5] The actions of Cardinal's corporate counsel, Alan Gross, also lend substantial credence to Kraus' testimony. Gross asserted during his testimony that Noll had told him just before leaving for the Middle East that there was no agree-

4. The full text of the letter of November 17, 1980, written to Kraus by Robert G. Markey, a member of Cardinal's board of directors and a law partner of attorney Koykka, is as follows:

> Dear Bill:
>
> I am dictating this letter to you at 1:30 p. m. on Saturday, November 15. I have now had an opportunity to digest what you had to say earlier today and I have also spoken with George Grabner. George has now told me some things he did not tell me when I talked with him earlier in the week. When I first discussed the question of your authority with him, he told me that so far as he was concerned, you had no authority to bind the Corporation. Perhaps it was only semantics, *but when we talked earlier today, George told me that a decision respecting the $820,000 settlement proposal was made on October 21, that it was Darwin's idea* and that so far as he was concerned, the only question that remained open as they left for the Middle East was whether you should hold a power of attorney to make the deal.
>
> I can't believe all of this is true, but I have no choice. I still think *the settlement* stinks, but my respect and regard for you are such that I cannot let my letter of November 14 stand without this apology. Please accept it in the spirit in which it is given.
>
> Sincerely,
> /s/
> Robert G. Markey

(Emphasis added).

5. The Court holds doubts concerning the propriety of Mr. Koykka's representation of Cardinal in light of Markey's testimony. Mr. Koykka is a partner in the same law firm as Markey, and called Markey to testify as a witness on behalf of his client, Cardinal. The Court had to elicit the fact that Koykka and Markey are partners through its own questions since Koykka did not elicit that information in his direct examination of Markey. DR 5–102(A) mandates that a lawyer withdraw from representation when it becomes obvious that a lawyer in his firm ought to be called as a witness on his client's behalf, unless one of the exceptions enumerated in DR 5–101(B)(1)–(4) applies. Under a generous reading of Markey's testimony, the Court believes that Koykka may have had a good faith belief that DR 5–101(B)(1) applied to this case. Even so, he was remiss in failing to bring this issue to the attention of the Court prior to or during the trial.

In its posttrial memorandum, Cardinal has relied on a portion of the deposition of Markey. The passage relates to Markey's perceptions of Kraus' actions and conduct and Cardinal relies on it to impeach Kraus' credibility. The Court must view skeptically the testimony of Markey because of his financial interest in the case, both as a director of Cardinal and as a partner in the law firm representing Cardinal. This is particularly true in light of the letter of November 17, 1980, from Markey to Kraus, which is set out in footnote 4 above.

ment. Before Noll returned from the Middle East, however, Gross gave Kraus his comments on the Schmidt letter which clearly and unambiguously states that an oral contract had been made. The Court finds it inconceivable that a lawyer in Gross' position as corporate counsel would not object to this language, both to Kraus and to Bergstrom's attorneys, if indeed he had been told by the president and dominant stockholder of the company that there was no agreement.

Additionally, the Court considers it necessary to discredit the testimony of Darwin Noll. Noll's actions reveal that he sought and relied on too much advice from too many sources. Noll received advice from at least seven different lawyers in connection with this lawsuit, delegating individual tasks to some and supervisory powers to others.[6] Such a situation is bound to lead to conflicting advice. Noll also sought advice from other circles, including directors Grabner and Miller and his brother, Sanford Noll. The Court is convinced that Noll decided during the breakfast meeting on October 21, 1980, to try to settle the case and gave Kraus authority to make the offer to Bergstrom's attorneys. Noll began having second thoughts about the settlement during the trip to the Middle East, during which he discussed the settlement with his brother and with Grabner. Noll decided to repudiate the settlement either during or shortly after returning from the trip. Noll's letter to Kraus of November 6, 1980, explains his change of mind but the language confirms that an "offer of $820,000" had been made by Cardinal. Noll was disserved by the conflicting advice and pressure he received from his lawyers and advisers, and his actions and testimony reflect the conflicting pressures. While Noll may

be a successful businessman, it is absolutely clear to the Court, at least as to this matter, that he was swayed by the last person to whom he talked. That characteristic of Noll will not be permitted by this Court to be used to disavow the actual and apparent authority Noll vested in attorney Kraus to settle this case, nor may it be used to deprive plaintiff of a settlement reached after full and fair negotiations.

### III. CHOICE OF LAW

The parties disagree over what body of law should be applied in this case. The plaintiff primarily cites Minnesota law. The defendant contends that if a contract to settle was made, the last act was performed in Ohio and therefore Ohio law provides the rules of decision. Although the agreement to settle the lawsuit is in a general sense a contract, this is not a factor of controlling significance on the choice of law issue. The critical point to consider is that the underlying dispute involves a claim of patent infringement. Hence, this case implicates the operation of a network of federal statutes. Indeed, it falls within the exclusive jurisdiction of the federal courts. 28 U.S.C. § 1338(a). The federal courts are competent to apply their own law in deciding whether a lawsuit has been settled, and "[c]reation of a federal rule rather than absorption of a state rule is appropriate where, as here, the rights of the litigants and the operative legal policies derive from a federal source." *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981). *See Maynard v. Durham and Southern Ry.*, 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961); *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *Theatre Time Clock Co. v. Motion Picture Advertising Corp.*, 323 F.Supp. 172 (E.D.La.1971).

**6.** Noll hired Charles Steffey of Minneapolis to handle the initial trial regarding validity of the patent. Steffey has remained as local counsel for Cardinal in the subsequent litigation. Jon Nelson of the Allegretti law firm handled the major portion of the trial on the merits and part of the appeal. Thomas Koykka completed the appellate brief, and represented Cardinal at the hearing on remand. Noll also received advice from director Markey, a lawyer, and corporate counsel Gross. Noll hired Cleveland patent attorney William McCoy to advise him in connection with this lawsuit. Finally, Noll hired Kraus to negotiate for a settlement of the case.

## IV. VALIDITY OF THE SETTLEMENT AGREEMENT

■ The primary point of reference in this case is the salutary principle that "voluntary settlements of civil controversies are highly favored by courts and a valid agreement once reached, cannot be repudiated by the parties . . . ." *Theatre Time Clock Co. v. Motion Picture Advertising Corp.*, 323 F.Supp. 172, 174 (E.D.La.1971). In addition, there is considerable case law that agreements to settle federal lawsuits need not be in writing to be enforceable.[7] *Green v. John H. Lewis & Co.*, 436 F.2d 389 (3d Cir. 1971) (per curiam). *See Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981); *Strange v. Gulf & South American Steamship Co.*, 495 F.2d 1235 (5th Cir. 1974); *Theatre Time Clock Co. v. Motion Picture Advertising Corp.*, 323 F.Supp. 172 (E.D.La.1971). Agreements to settle federal causes of action have generally been analyzed in terms of any policies toward settlement expressed in the federal statutes underlying the cause of action and also tested by common law requisites for formation of contracts. *E.g., Fulgence v. J. Ray McDermott & Co.*, 662 F.2d at 1209 (Title VII includes a congressionally mandated policy of encouraging settlement); *Green v. John H. Lewis & Co.*, 436 F.2d at 390 (agreement must be voluntary); *Strange v. Gulf & South American Steamship Co.*, 495 F.2d at 1237 (agreement challenged on grounds of mutual mistake).

■ The public policy favoring peaceful settlement of lawsuits applies just as strongly to patent lawsuits as to any other lawsuit. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368 at 1373 (6th Cir.). The evidence in this case has established that Kraus and Williams reached an oral agreement to settle on October 24, 1980. The evidence also clearly establishes that Kraus had the authority, both actual and apparent, to enter such an agreement. The agreement was then reduced to writing in Schmidt's letter of October 28, 1980, which was circulated to, among others, Gross, the corporate counsel for Cardinal. There was agreement on all terms that were material to the settlement—the undertaking of Bergstrom to sell and Cardinal to buy the patent, the amount and timing of the payments on the purchase price, the manner in which the transaction would be treated for tax purposes, and the dismissal of the litigation. Cardinal has argued that the settlement agreement is unenforceable because certain terms had not been fully agreed upon. However, the fact that the parties later negotiated minor matters such as disposition of the plaintiff's inventory, security for installment payments and costs does not vitiate the validity of the agreement reached. Under facts analogous to the facts in this case, the court in *Leon Industries, Inc. v. I. C. N. Pharmaceuticals*, 472 F.Supp. 1241 (E.D.Mo.1979), stated:

> In order to determine whether the parties intended to be bound by the settlement prior to the execution of a written docu-

7. However, even if a statute of frauds were deemed to apply, the documentary evidence received at trial is sufficient to satisfy any statute of frauds requirement. The note or memorandum required by the statute need only identify the parties, the property and the general terms of the agreement with reasonable certainty, and the note or memoranda can consist of a series of writings internally connected by express or implied reference so as to show that they relate to the same subject matter. A typewritten name intended to authenticate a document suffices for a "signature." *Radke v. Brenon*, 271 Minn. 35, 134 N.W.2d 887 (1965). *Doyle v. Wohlrabe*, 243 Minn. 107, 66 N.W.2d 757 (1954); Restatement (2d) Contracts, §§ 131–34 (1981). Parole evidence may explain the terms of the note or memorandum for the purpose of determining whether it complied with the statute. *Greer v. Kooiker*, 312 Minn. 499, 253 N.W.2d 133 (1977). Moreover, courts have taken a common sense approach to the statute, interpreting the requirements in the manner necessary to further the statute's policy of preventing fraudulent conduct. *Id.* Given these legal standards, the Schmidt letter of October 28, 1980, and the documentary evidence of the settlement agreement authored by Cardinal's own representatives, including Kraus, satisfies any statute of frauds requirement. *E.g.*, Plaintiff's Exhibits 7 (with Alan Gross' notes), 8 (authored and signed by Darwin Noll), 30, 31, 32 (authored by Kraus), 33 and 34 (authored and signed by Robert Markey).

ment, this Court must consider the course of negotiations, agreement on material terms, whether the parties described the settlement as such, and whether any existing disagreements were merely technicalities.

*Id.* at 1242. In this case, the parties plainly intended to be bound by the oral agreement reached on October 24, 1980. All the material terms were agreed upon. All of the terms Cardinal contends were left unresolved deal with insubstantial matters. The lawsuit was considered settled as of October 24, 1980, and the settlement was not contingent upon formal execution of a written memorial of the agreement.

## IV. AUTHORITY OF KRAUS

■ Cardinal's next contention is that Kraus had no authority to bind it to an agreement. This contention, however, is completely and utterly without foundation. The evidence established that Kraus was authorized by Noll, as president, board chairman, and owner of approximately 96 percent of the shares of the corporation, to settle the lawsuit. Noll dictated the terms of the offer to Kraus and told Kraus that the terms had originated from and been approved by a majority of the directors of Cardinal.

■ Even if this express authority were absent, Cardinal would be bound by the agreement because it was made within Kraus' apparent authority. The doctrine of apparent authority holds that

where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he was

apparently clothed. This rule has been based upon the principle that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong and cause the loss.

3 Am.Jur.2d *Agency* § 76 (1962) (footnotes omitted). *See* 2A C.J.S. *Agency* § 157 (1972). A related rule of agency law applies to the facts of this case.

Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance.

Restatement (Second) of Agency § 43(1) (1958).

Kraus was retained by Cardinal for the specific purpose of pursuing a settlement of this lawsuit. Bergstrom's attorneys inquired of Cardinal regarding Kraus' status, and representatives of Cardinal confirmed that Kraus had been retained. Thus, a strong inference arose that Kraus' subsequent acts in pursuance of settlement were authorized. In the initial discussions, Kraus' authority was expressly limited to negotiating. However, on October 21, 1980, he approached Bergstrom's attorneys with a new offer of a different package than had been negotiated earlier. He acted in the same manner as any other attorney with authority to settle a lawsuit, as indeed he did have. Cardinal's representatives at no time did anything to indicate to the plaintiff that Kraus had less than full authority to settle, despite the fact that they were in frequent contact with Williams during this time period. When Cardinal's house counsel received the drafts of the settlement letter from Schmidt, he failed to disavow the agreement. At no time did anyone from Cardinal take the simple and effective step of informing the plaintiff that Kraus' authority had been terminated. Thus, the

facts of this case demonstrate that Kraus had authority to bind Cardinal to an agreement to settle the litigation, and that Cardinal indicated acquiescence in Kraus' conduct until such time as an intention to renege on the deal had been solidly formulated.

## VI. OTHER CONDITIONS

 Finally, Cardinal argues that certain conditions had been imposed on the offer and had not been satisfied. This contention is also belied by the facts. Noll instructed Kraus to check with Arthur Andersen to make sure that the financial statement could be "certified." Kraus met several times with James Thailing of Arthur Andersen before making the deal with Williams. Thailing stated that the financial statement could be certified if the patent was listed as a capital asset and if the statement were subject to a qualification, or that the patent could be treated differently on the financial statement than on the tax return if a schedule showing a reconciliation were also filed. It is clear that Kraus believed that he had the necessary assurances from Arthur Andersen. In any event, these conditions were not a part of the negotiations between the parties. If Kraus exceeded his authority by consummating the agreement before receiving the necessary assurances, he was still acting within his apparent authority. If Cardinal is entitled to any remedy, it is against Kraus or others, not by nullifying the agreement with the plaintiff.

## VII. SUMMARY OF AGREEMENT AND ITS ENFORCEMENT

 In summary, the Court finds that an agreement was reached by the parties, and that it was complete enough to be enforced. The essential terms of the agreement are that the plaintiff would sell and Cardinal would purchase U. S. Design Patent No. 228,728 and Canadian Patent No. 35,918. Cardinal was to make an initial payment of $500,000 on or before November 15, 1980. Additional payments of one dollar per item manufactured or sold by Cardinal, its successors, assigns or licensees after November 15, 1980, would be paid to the plaintiff. Payments were to be made quarterly, beginning February 15, 1981, and continuing for 16 consecutive quarters. In no event would the quarterly payments be less than $20,000, and each payment was to be accompanied by a report showing how it was calculated. The plaintiff would treat the transaction as the sale of a capital asset and claim capital gains treatment for the entire purchase price. Cardinal would treat the transaction as an acquisition of a capital asset for federal income tax purposes, and amortize the cost over the remaining useful life. The plaintiff also agreed to dismiss the pending litigation.

 A trial court possesses inherent power to enforce settlement agreements in cases pending before it. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *Wood v. Virginia Hauling Co.*, 528 F.2d 423, 425 (4th Cir. 1975). "The power of a trial court to enter a judgment enforcing a settlement agreement has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation." *Kukla v. National Distillers Products Co.*, 483 F.2d 619, 621 (6th Cir. 1973). If there is no disagreement over the fact of the agreement, it may be summarily enforced; otherwise, an evidentiary hearing is proper. *Aro Corp. v. Allied Witan Co.*, 531 F.2d at 1372; *Wood v. Virginia Hauling Co.*, 528 F.2d at 425; *Kukla v. National Distillers Products Co.*, 483 F.2d at 621–22; *Massachusetts Casualty Insurance Co. v. Forman*, 469 F.2d 259, 260 (5th Cir. 1972) (per curiam), cert. denied, 424 U.S. 914, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976).

 If a settlement is reached pending appeal, the authority of a district court may be limited by the terms of the remand. The order remanding this lawsuit directs the Court to take evidence "on the issue of whether a settlement was reached and to

pass on that issue." By directing the Court "to pass on" the issue, the Court of Appeals has authorized the Court to supervise disposition of the dispute in ways justified under the circumstances. The Court does not interpret the order as being a limitation on the Court's inherent power to enforce settlement agreements.

Under the terms of the agreement reached by the parties, Cardinal was to have made its initial payment of $500,000 on November 15, 1980. In addition, it was to have made 16 quarterly payments of not less than $20,000 each beginning on February 15, 1981. Therefore, the Court will order Cardinal to pay, within 30 days from the date of this order, those payments that are delinquent as of the date of this order. In addition, Cardinal shall pay interest at the legal rate from the date the payments should have been made. Cardinal will also be ordered to make the remaining quarterly payments in the amounts and on the same schedule as required by the settlement agreement. As a condition for obtaining the amounts awarded in this order, Bergstrom shall tender to Cardinal an unconditional assignment of all right, title and interest in U. S. Design Patent No. 228,728 and Canadian Patent No. 35,918.

Based on the foregoing IT IS HEREBY ORDERED that:

1. Within 30 days of the date of this Order, the parties shall perform their obligations under the settlement agreement as set forth in this Memorandum and Order.

2. Within 30 days of the date of this Order, defendant Cardinal American Corporation shall pay to the plaintiff the following sums:

 (a) $500,000, together with interest at the legal rate from November 15, 1980, to the date of payment; plus

 (b) $20,000, together with interest at the legal rate from February 15, 1981, to the date of payment; plus

 (c) $20,000, together with interest at the legal rate from May 15, 1981, to the date of payment; plus

 (d) $20,000, together with interest at the legal rate from August 15, 1981, to the date of payment; plus

 (e) $20,000, together with interest at the legal rate from November 15, 1981, to the date of payment; plus

 (f) $20,000, together with interest at the legal rate from February 15, 1982, to the date of payment.

3. Defendant Cardinal American Corporation shall pay to the plaintiff 11 additional installments of at least $20,000 as they become due beginning May 15, 1982.

4. Within 30 days of the date of this Order, the plaintiff shall assign all right, title and interest in U. S. Design Patent No. 228,728 and Canadian Patent No. 35,918 to defendant Cardinal American Corporation.

5. At such time as the plaintiff certifies to the Clerk of United States District Court that the provisions of paragraphs 2 and 4 of this Order have been fulfilled, the Clerk of District Court shall vacate the judgment in the amount of $1,455,194.50 entered by this Court on July 17, 1980.

LET JUDGMENT BE ENTERED ACCORDINGLY.