CAPITAL DREDGE AND DOCK COR-PORATION, an Ohio corporation, Plaintiff-Appellant,

v.

CITY OF DETROIT, a municipal corporation, Defendant-Appellee.

No. 84–1173.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 13, 1986.

Decided March 19, 1986.

Opinion on Rehearing Sept. 4, 1986.

Rehearing and Rehearing En Banc Denied Nov. 20, 1986.

E. Michael Morris, C. William Garratt & Associates, Bloomfield Hills, Mich. (C. William Garratt, argued), for plaintiff-appellant.

Eric L. Clay, Helen Francine Strong (City of Det.), Strong, Lewis, White, & Clay, Detroit, Mich. (Harold D. Pope, argued), for defendant-appellee.

Before MERRITT and WELLFORD, Circuit Judges, and EDWARDS, Senior Circuit Judge.

MERRITT, Circuit Judge.

Plaintiff-appellant Capital Dredge & Dock Corp. Dredge appeals a District Court order granting partial summary judgment against Capital Dredge in its suit against defendant-appellee City of Detroit, Michigan and a subsequent order dismissing, under rule 12(b)(6) of the Federal Rules of Civil Procedure, a related suit against the city. The District Court ruled that some of Capital Dredge's claims against the city were barred by an express release executed by Capital Dredge and by the statute of limitations. We affirm the District Court on the question of express

release, but we reach no holding on the statute of limitations question.

## I. FACTS

In the late 1960s, the City of Detroit undertook the Lake Huron Station Raw Water Intake Project to bring fresh water from the lake to the city. The project involved construction of a water intake "crib" in 100 feet of water more than six miles off shore and a tunnel beneath the lake-bed through which water was to flow from the intake point to the shoreline, from where it was to be piped to Detroit. On June 7, 1971, Detroit and the Indian River Construction Company entered into a contract under which Indian River was to be the general contractor for the project (except that the tunnel was to be built by a different contractor). On that same date, Indian River subcontracted part of the work to Capital Dredge (who in turn entered into agreements with other subcontractors).

On December 11, 1971, there was an explosion in the tunnel. It caused the injury and death of several workers, significant property damage, and a lengthy shutdown of work on the project. All parties involved in the project blamed each other for the explosion. Certain actions arising out of the explosion were filed against Capital Dredge, which hired an attorney, one Alteri, to defend it against these claims.

On January 22, 1973, Detroit and Indian River amended their contract. By this amendment, they increased the amount of compensation due Indian River, extended the time in which the project was to be completed, and preserved certain claims for extra work performed. On December 11, 1974, Capital Dredge filed an action against Detroit seeking damages for impairment of its bonding capacity and diminishment of its reputation resulting from the city's alleged responsibility for the explosion. On May 15, 1974, Detroit and Indian River again amended their contract. Again they increased the amount of compensation, extended the time, and preserved extra work claims. On this same day, Indian River's contract with the city was assigned to Capital Dredge so that Capital Dredge became the general contractor on the project.

In June 1976, the defendants against whom claims arising from the tunnel explosion had been asserted (including both Capital Dredge and the city) agreed to settle all claims against each other for indemnification and contribution in wrongful death and personal injury cases arising out of the explosion. They negotiated and drafted a settlement document entitled "Minutes of Settlement." Alteri, who represented Capital Dredge in the settlement process, signed this document on June 30, 1976. The City of Detroit has asserted that paragraph two of this document constitutes a release of some of Capital Dredge's claims against Detroit, which Capital Dredge had advanced in the case at bar. This provision of the Minutes of Settlement is quoted below.

On February 27, 1980, Capital Dredge filed a diversity action against Detroit (the "1980 action"). The complaint had four counts. Count I covered the period from December 11, 1971 (the date of the explosion) to May 15, 1974 (the date the contract was assigned to Capital Dredge). It sought damages for delay and costs attributable to extra work not included in the general contract, all of which resulted from the tunnel explosion. Count II covered the period from May 15, 1974 through the end of 1974. It sought damages for the expenses of extra work required by Detroit but not included in the general contract. Count III covered the period from 1975 through completion of the project in 1976. It sought damages for delay and expenses of extra work required by Detroit but not included in the general contract. Count IV sought recovery of the unpaid balance on the general contract remaining after completion of the project.

The city moved for summary judgment, and on October 2, 1981, the District Court granted the city's motion as to all of count I and parts of the second and third counts. Judge Joiner of the United States District Court for the Eastern District of Michigan

held that Capital Dredge had released all the claims in count I and some of the claims in counts II and III by executing the Minutes of Settlement. The District Court further held that the claims stated in count I were not contract claims but were either tort claims, governed by Michigan's three-year statute of limitations, Mich.Comp. Laws Ann. § 27A.5805, or claims in "other personal actions," governed by a six-year statute of limitations, § 600.5813. Reasoning that under either section the cause of action would have accrued on the date of the explosion, December 11, 1971, the District Court held that the count I claims, which were filed more than eight years after the explosion, were barred by the statute of limitations.

On November 12, 1981, Capital Dredge moved the District Court to reconsider its opinion or to allow it to amend its complaint. The District Court slightly modified its holding on the release issue as discussed below, but the court otherwise refused to reconsider its opinion and to allow Capital Dredge to amend its complaint.

On June 30, 1982, in an apparent effort to avoid the statute of limitations question, Capital Dredge filed another diversity action against Detroit (the "1982 action"). In this action Capital Dredge asserted unspecified extra work claims but this time clarified that its claims were brought under Capital Dredge's contract and were not tort claims. On August 29, 1983, the District Court granted the city's motion under rule 12(b)(6) and dismissed this action "for reasons stated by the Court on the record." Despite its dismissal, this action was consolidated with the 1980 action. In October 1983, just before Capital Dredge's surviving claims from the 1980 action were scheduled to go to trial, Capital Dredge and Detroit settled all the remaining claims.

## II. RELEASE

The dispute concerning Capital Dredge's alleged release of certain claims against the city revolves around paragraph two of the Minutes of Settlement, which provides:

It is agreed by and between the signatories hereto that Capital Dredge and Dock Corporation will dismiss with prejudice a certain suit pending against the City of Detroit in the United States District Court entitled *Capital Dredge and Dock Corporation, et al. v. City of Detroit, et al,* being Case No. 472–944, preserving claims by Capital against the City of Detroit for extra work and delays not previously compensated for and arising solely out of a certain Change Order to Amendment # 2 to Contract LH–6D dated May 13, 1975.[1]

Case No. 472–944 to which this provision refers is Capital Dredge's bonding capacity and reputation suit filed December 11, 1974.

The District Court held that this provision would support only one interpretation, that being that Capital Dredge released all extra work claims that were not for work done pursuant to the change order referred to in paragraph two. The Change Order stated:

Remove remaining sheet piling and template spouds during the 1975 construction season by means of additional excavation of frozen material on the lake bottom and use of a barge mounted 700 ton A-frame and hydraulic trip jar or other suitable means. In areas of over excavation place stone fill to restore to proper grade. Modify temporary intakes. All work to be as described in our letter of July 2, 1975.

REASON FOR CHANGE: The lake bottom did not thaw as rapidly as anticipated thus requiring extraordinary means of piling removal in order to complete the work during the 1975 construction season. These changes to result in an increase in the contract sum on a cost plus limited amount basis not to exceed $225,-000.

1. The May 13 date in the Minutes of Settlement is an error. The correct date of the change order was August 13, 1975. After Capital moved to reconsider, Judge Joiner changed his ruling to account for correction of this error.

On this ground, the District Court held that Capital Dredge had released all of the claims in Count I of its 1980 complaint and some of the claims in both counts II and III.

Capital Dredge argues that the provision is ambiguous and, therefore, that under Michigan's parol evidence rule the District Court should have considered extrinsic evidence to ascertain the parties' intended meaning in executing the provision in question. Capital Dredge also asserts that Alteri, who negotiated the Minutes of Settlement on behalf of Capital Dredge, had no authority to release any of Capital Dredge's extra work claims. On this point, the District Court ruled that Capital Dredge had ratified its release in the Minutes of Settlement by failing to disavow Alteri's authority or otherwise challenge the Minutes of Settlement for four years after their execution.

### A. Extrinsic Evidence

As noted above, Capital Dredge argues that the Minutes of Settlement should be interpreted in light of extrinsic evidence of the parties' intent. The city asserts that the District Court allowed Capital Dredge to discover extrinsic evidence on this issue and that all the extrinsic evidence discovered supports the District Court's interpretation of the Minutes of Settlement. The record in this case contains transcripts of depositions of William Booth, Robert Russell, and Richard McClear, three of the six signatories to the Minutes of Settlement. All three of these deponents represented parties to the settlement (McClear represented the city) and were involved in negotiating and drafting the Minutes. All three state that it was their understanding and intent that, in accord with the District Court's interpretation, Capital Dredge was releasing all claims not arising out of the change order referred to by the Minutes of Settlement. The city also points out that in a related action Mr. Russell stated to the court on the record that he believed Capital Dredge had released the claims involved in the case at bar by signing the Minutes of Settlement. In that same case, Mr. Alteri, the attorney who had represented Capital Dredge in negotiating the Minutes, stated on the record that he would affirm what Mr. Russell had said.

In short, the city argues that it would be useless to remand in order for the District Court to consider extrinsic evidence on the meaning of the Minutes of Settlement because Capital Dredge has already tried and failed to find some evidence that the signatories intended paragraph two to mean anything other than Judge Joiner's interpretation. At oral argument, counsel for Capital Dredge conceded this point. He admitted that the only evidence supporting a contrary interpretation was found in affidavits by parties representing Capital Dredge who stated that Alteri had no authority to release Capital Dredge's extra work claims. This evidence does not bear directly on the question of what the people who negotiated the Minutes of Settlement intended that paragraph two should mean. This evidence deals with the issue of Alteri's authority, not with what the signatories intended that the Minutes would mean.

█ Normally we would not look to extrinsic evidence to resolve a dispute over whether the court should consider extrinsic evidence. However, in the light of this concession by Capital Dredge, we decline to rule on the District Court's holding that the Minutes of Settlement are ambiguous on their face and on Capital Dredge's argument that the Minutes should be interpreted in light of extrinsic evidence. *See Hooks v. Hooks,* 771 F.2d 935, 945 (6th Cir.1985) (the Court may examine the whole record and base its decision on points not addressed by the District Court). We turn directly to the question of Alteri's authority to release Capital Dredge's claims for extra work and delay.

### B. Authority of Alteri

Before the District Court, Capital Dredge submitted affidavits to the effect that its representatives specifically instructed Alteri not to compromise any of Capital Dredge's claims for extra work and delay. Capital Dredge argues that even if

the Minutes of Settlement constitute an unambiguous release of Capital Dredge's claims, Capital Dredge should not be bound by this release because, to the extent the Minutes constitute a release, they were executed by Alteri without authority from Capital Dredge. Even if Alteri had no express authority to release the claims, the city would prevail if it could be shown that Capital Dredge ratified the release or that Alteri had apparent authority to release the claims.[2]

### 1. Ratification

■ Judge Joiner held that Capital Dredge's acceptance of the benefits of the Minutes while failing to challenge the Minutes for a period of "at least four years" after receiving them amounted to a ratification of the release by Capital Dredge. Failure to repudiate an unauthorized agreement and accepting the benefits of such an agreement can constitute a ratification. See Restatement (Second) of Agency §§ 94, 98 (1958). However, one essential prerequisite to a principal's ratification of an unauthorized act is that at the time of the ratification the principal have knowledge of all material facts. Langel v. Boscaglia, 330 Mich. 655, 48 N.W.2d 119 (1951); Restatement (Second) of Agency §§ 91, 98.

■ Genuine issues of material fact exist as to when Capital Dredge learned that the Minutes of Settlement arguably constituted a release of its claims. Therefore, the District Court's grant of summary judgment on the release issue was improper in so far as it relied on Capital Dredge's alleged ratification of the release. Fed.R. Civ.P. 56.

### 2. Apparent Authority

According to the Restatement of Agency, [a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.

Restatement (Second) of Agency § 8. Michigan courts accept this definition of apparent authority. See Grosberg v. Michigan National Bank-Oakland, 420 Mich. 707, 362 N.W.2d 715 (1984). If a third party, based on a principal's manifestations, reasonably believes that the supposed agent is authorized to enter into a transaction or agreement, the principal will not be allowed to deny liability under the agreement even if the agent had no actual authority to act for the principal. Apparent authority is created by the principal's manifestations to the third party; the principal's communications with the supposed agent are not relevant to the question of apparent authority. Michigan National Bank of Detroit v. Kellam, 107 Mich.App. 669, 309 N.W.2d 700 (1981).

■ Generally, when a client hires an attorney and holds him out as counsel representing him in a matter, the client clothes the attorney with apparent authority to settle claims connected with the matter. See Terrain Enterprises, Inc. v. Western Casualty & Surety Co., 774 F.2d 1320 (5th Cir.1985); Bergstrom v. Sears, Roebuck & Co., 532 F.Supp. 923 (D.Minn.1982); Walker v. Stephens, 3 Ark.App. 205, 626 S.W.2d 200 (1981); Hutzler v. Hertz Corp., 39 N.Y.2d 209, 383 N.Y.S.2d 266, 347 N.E.2d 627 (1976); cf. Sustrik v. Jones & Laughlin Steel Corp., 189 Pa.Super. 47, 149 A.2d 498 (1959); Rader v. Campbell, 134 W.Va. 485, 61 S.E.2d 228 (1949). But see Blanton v. Womancare, Inc., 38 Cal.3d 396, 696 P.2d 645, 212 Cal.Rptr. 151 (1985). Thus, a third party who reaches a settlement agreement with an attorney employed to represent his client in regard to the settled claim is generally entitled to enforcement of the settlement agreement even if the attorney was acting contrary to the client's express instructions. In such a situation, the client's remedy is to sue his attorney for professional malpractice. The third party may rely on the attorney's apparent authority unless he has reason to believe

---

2. We will not discuss other possible analyses such as inherent agency power, Restatement (Second) of Agency § 8A, and estoppel, id., at § 8B.

that the attorney has no authority to negotiate a settlement.

But for this rule of law, prudent litigants could not rely on opposing counsel's representation of authorization to settle. Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer. The courts of Michigan have evidently not specifically addressed the apparent authority question in the attorney-client context. In *Michigan National Bank v. Kellam, supra,* the Michigan Court of Appeals held that an attorney had no apparent authority to bind a partnership (whose partnership agreement the attorney had written) in dealings with third parties. However, the court noted that the attorney worked for one of the partners individually and was not hired by the partnership to handle the matter that the third parties presented. In *Wells v. United Savings Bank,* 286 Mich. 619, 282 N.W. 844 (1938) and *Peoples State Bank v. Bloch,* 249 Mich. 99, 227 N.W. 778 (1929), the Michigan Supreme Court held that an attorney has no *implied* authority to settle or compromise a matter, but the court did not reach the question of *apparent* authority. We believe that Michigan courts would adopt the general rule stated above on apparent authority arising from the attorney-client relationship; in the absence of Michigan precedent to the contrary, we will apply this rule.

■ Capital Dredge has not argued that Alteri lacked authority to negotiate a settlement of any controversies arising from the explosion. To the contrary, Alteri was employed to represent Capital Dredge regarding certain claims arising from the explosion. Capital Dredge held Alteri out as having authority to represent it in not only the personal injury claims but also certain related claims against the city, such as the bonding capacity and reputation suit which Alteri filed on behalf of Capital Dredge. In these circumstances, the city could reasonably believe that Alteri had authority to release Capital Dredge's extra work and delay claims arising from the explosion. Alteri therefore had apparent authority to release these claims. Consequently, we affirm the District Court's ruling that, by the Minutes of Settlement, Capital Dredge released certain claims from the 1980 action, although we do so on slightly different grounds than were used by Judge Joiner.

## III. CONCLUSION

Our holding on the release question supports the District Court's dismissal of all claims in count I of Capital Dredge's 1980 complaint plus other claims in counts II and III, as specified in Judge Joiner's opinion. Because the District Court's holding on the statute of limitation issue affects only the claims in count I of the 1980 complaint, which are subject to our holding on the release question, we state no opinion on the statute of limitations analysis employed by Judge Joiner. We are unable to ascertain the basis for Judge Joiner's decision to dismiss the 1982 complaint, and we are unable to determine whether the claims stated by Capital Dredge's 1982 complaint were released by the Minutes of Settlement. We therefore confine our holding on the release issue to the 1980 complaint.

Accordingly, the District Court's order granting summary judgment as to all of count I and parts of counts II and III of the 1980 complaint is affirmed. We remand to the District Court for determination of whether any part of the 1982 complaint was also released by the Minutes of Settlement.

ON PETITION for Rehearing

In our unpublished opinion on Capital Dredge and Dock Corporation's appeal, we held that, in accord with general principles of agency, "a third party who reaches a settlement agreement with an attorney employed to represent his client in regard to the settled claim is generally entitled to enforcement of the settlement agreement even if the attorney was acting contrary to the client's express instructions." *Capital Dredge & Dock Corp. v. City of Detroit,* 800 F.2d 525, at 530–531 (6th Cir.1986) [hereafter cited as "Opinion"]. We noted

that under Michigan law an attorney has no *implied* authority to compromise the client's claims, but we held that, in the context of this case, the City of Detroit could rely on the *apparent* authority of Capital Dredge's counsel to settle Capital Dredge's claims against the city. We recognized that state law governs the substantive matters of this diversity action, and we stated: "We believe that Michigan courts would adopt the general rule stated above on apparent authority arising from the attorney-client relationship; in the absence of Michigan precedent to the contrary, we will apply this rule." Opinion at 10.

Appellant Capital Dredge petitioned for rehearing of its appeal arguing that Michigan precedent runs contrary to the general rule on apparent authority as stated in our opinion. Capital Dredge asserts that in *Michigan National Bank of Detroit v. Patmon,* 119 Mich.App. 772, 327 N.W.2d 355 (1982) and *Coates v. Drake,* 131 Mich. App. 687, 346 N.W.2d 858 (1984), the Michigan Court of Appeals "rejected any notions of apparent or implied authority being sufficient to bind a client to a settlement." Appellant's Memorandum in Support of Petition for Rehearing at 3.

Both of these cases cited *Henderson v. Great Atlantic & Pacific Tea Co.,* 374 Mich. 142, 147, 132 N.W.2d 75, 78 (1965), in which the Michigan Supreme Court stated:

> "The almost unanimous rule, laid down by the courts of the United States, both Federal and State, is that an attorney at law has no power, by virtue of his general retainer, to compromise his client's cause of action; but that precedent special authority or subsequent ratification is necessary to make such a compromise valid and binding on the client."

(Quoting Annot., 66 A.L.R. 107, 108 (1930)). Both *Patmon* and *Coates* apply this rule and hold that "a settlement, made by an attorney without prior special authorization ... by the client, is not binding on the client." *Coates,* 131 Mich.App. at 694, 346 N.W.2d at 861.

■ The holdings of *Henderson, Patmon,* and *Coates* do not contradict the general rule on apparent authority stated in our earlier opinion. In general agency terms, these cases hold that an attorney does not generally have *implied* authority to compromise the client's claim. The Michigan courts have refused to find that a client implicitly authorizes his attorney to settle his claim when the client employs the attorney. Having rejected the notion of implied authority in this context, the courts require the client's express authorization to settle. The cases do not, however, deal with the question of a lawyer's *apparent* authority to settle a claim. The most that can be said of these cases is that their silence on the question of apparent authority might tend to support an inference that the Michigan courts would not adhere to the majority rule on apparent authority.

As noted in our earlier opinion, however, rejection of the general rule on apparent authority would result in an unworkable situation:

> [P]rudent litigants could not rely on opposing counsel's representation of authorization to settle. Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer.

Opinion at 11. Contrary to Capital Dredge's assertions, the Michigan courts have not specifically addressed the apparent authority question in this attorney-client context. We decline to infer an unreasonable result from the Michigan courts' silence on the issue.

If the Michigan courts in *Henderson* and *Coates* had extended their ruling to the apparent authority question and had held that the settlement could not be enforced against the client under either implied or apparent authority principles (as Capital Dredge would have us hold here), the holdings would have been consistent with general agency principles. In *Henderson* and *Coates* the attorneys negotiated a settle-

ment of their clients' claims (purportedly acting as agents for the clients), forged the clients' names on the settlement checks, negotiated the checks, and converted the proceeds to their own use. This situation is governed by a generally applicable principle of agency law—that when an agent is acting purely for his own motives or benefit, the principal is not responsible for the agent's actions under theories of either implied or apparent authority.

The Restatement of Agency illustrates this principle in the comments to section 246. This section states that "[a] master is subject to liability for the tortious institution or conduct of legal proceedings by a servant acting within the scope of employment." Restatement (Second) of Agency § 246 (1958). In regard to this section, comment b provides:

> In order to cause the master to be civilly responsible for the conduct, the act must, of course, constitute a tort. Thus, in malicious prosecution, the prosecutor must have acted for a purpose other than that of promoting justice. *This fact does not prevent the master from being liable, although he has authorized only conduct actuated by lawful motives. If, however, the servant, although purporting to act for him, has no purpose of serving the interests of the master or of acting on account of his business, the master is not liable.*

(Emphasis added).

 Thus, the client is generally responsible for the attorney's actions even though the client has not authorized the attorney to commit the tortious acts. It should be noted that the only possible agency theory for such liability is apparent authority; the client has not expressly or implicitly authorized the attorney to engage in tortious conduct. However, if the attorney "has no purpose of serving the [client's] interests," the client is not responsible under apparent authority principles for the attorney's acts. *See also* Restatement (Second) of Agency

§ 246 illustrations 2 & 4 (providing another example of this principle's application).

Similarly, in the settlement context, if the attorney is serving only his own interest in absconding with the settlement proceeds, as in *Henderson* and *Coates*, under this general principle of agency the client is not bound by the settlement. However, if the attorney is attempting to serve the client's interest but merely exceeds the bounds of his express or implied authority, as in *Patmon,* general agency principles applied to the apparent authority doctrine [1] dictate that the client be held bound by the settlement. *See* Restatement (Second) of Agency § 246 illustrations 2 & 3. In such cases the results under implied authority and apparent authority analyses may differ. This is true of the case at bar. Accordingly, Capital Dredge's petition for rehearing is denied.

In our earlier opinion, we noted that the remedy available to a client whose attorney has exceeded his authorization in compromising the client's claim is to sue the attorney for professional malpractice. Opinion at 10. In 1982, Capital Dredge sought this remedy in Michigan state court. Capital Dredge sued its insurer and Mr. Alteri claiming, among other things, that Alteri had executed the Minutes of Settlement without Capital Dredge's authorization. After a jury returned a verdict against Capital Dredge, Michigan Circuit Court Judge Michael Connor entered a judgment of no cause of action on June 20, 1985. This judgment was apparently never appealed. The City of Detroit has argued that this judgment renders Capital Dredge's arguments moot. In light of our disposition of Capital Dredge's claims, we state no opinion as to whether the collateral estoppel effect of this judgment bars Capital Dredge's present argument that Alteri executed the Minutes of Settlement without authority.

---

1. "The rules of interpretation of apparent authority are ... the same as those for [express] authority, substituting the manifestation to the third person in place of that to the agent." Restatement (Second) of Agency § 8 comment a.

WELLFORD, Circuit Judge, dissenting.

Upon reconsideration of the issue of the attorney's apparent authority to settle his client's case, which was the basis for our original disposition, petitioner directs our attention to *Coates v. Drake*, 131 Mich. App. 687, 346 N.W.2d 858 (1984). *Coates* holds that

> [A] settlement, made by an attorney without prior special authorization and which was not subsequently ratified by his client, is not binding on the client, and ... this rule applies equally to cases where relief from a judgment or court order is sought.

346 N.W.2d at 861. *Coates* relies on *Henderson v. Great Atlantic & Pacific Tea Co.*, 374 Mich. 142, 132 N.W.2d 75 (1965), for this rule and also makes reference to *The Bradford Exchange v. The Trein's Exchange*, 600 F.2d 99, 102 (7th Cir.1979), which holds that "an attorney may not consent to a final disposition of his client's case without express authority." *See also Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir.1980).[1] In our panel decision we made no reference to these cases, but rather cited other federal authority and authority from several other states to the effect that an attorney has "apparent authority to settle claims." *Coates* acknowledged, as does *The Bradford Exchange*, that "it is to be presumed that the attorney had authorization and the movant [seeking relief from an unauthorized settlement] must overcome that presumption." 346 N.W.2d at 862. We acknowledged that Michigan has held that the attorney has "no *implied* authority to settle or compromise" without express authority.[2]

The question in light of *Coates* is whether Michigan would recognize an attorney's *apparent* authority to settle his client's claim when it does not recognize an attorney's implied authority to settle without special authorization. *Michigan National Bank of Detroit v. Kellam*, 107 Mich.App. 669, 309 N.W.2d 700 (1981), discussed "the prerequisites necessary to a finding of agency by apparent authority." 309 N.W.2d at 705. It decided that the trial court had erroneously held that an attorney who had formed a partnership and represented the principal partner had apparent authority to bind that partnership to an agreement relied upon by the other parties to that agreement. This holding came about despite the attorney's representation that he had such authority. *Id.* ("Apparent authority ... may not be established by representations of the agent."). *See also Grosberg v. Michigan National Bank*, 420 Mich. 707, 362 N.W.2d 715 (1984) (clarified the law as to both the apparent and implied authority of a partner to act on behalf of a partnership emphasizing "inherent agency power" of a partner).

I believe the cases discussed raise a substantial question whether Michigan will follow the general rule allowing an attorney clothed in only apparent authority to compromise his client's claim. I would therefore certify the issue to the Supreme Court of Michigan. If the Michigan Supreme Court declines to decide the issue, I would remand to the trial court to make a factual finding on the apparent authority issue. Accordingly, I would withdraw our previous disposition and certify the case for resolution of the question of attorney Alteri's authority to compromise and settle Capital's claims.

---

1. These cases also stand for the proposition that a purported settlement effectuated by the attorney without his client's consent may be set aside.

2. In *Presnell v. Board of City Road Commissioners*, 105 Mich.App. 362, 306 N.W.2d 516 (1981), the court stated:

> [I]t has been said that [an] "attorney who has the conduct of a lawsuit is presumed to have authority to act in his client's behalf." *Jackson v. Wayne Circuit Judge*, 341 Mich. 55, 59, 67 N.W.2d 471 (1954). This general rule, however, has *not* been extended to permit an attorney to compromise a client's claim absent specific authority from the client to do so.

306 N.W.2d at 518 (emphasis added); *see also Michigan National Bank v. Patmon*, 119 Mich. App. 772, 327 N.W.2d 355 (1982).