**FIRST NATIONAL BANK OF LOUIS-VILLE, Kentucky, Appellant,**

v.

**PROGRESSIVE CASUALTY INSURANCE COMPANY and Theresa Harrison, Appellee.**

Court of Appeals of Kentucky.

Oct. 4, 1974.

Rehearing Denied Jan. 24, 1975.

John G. Crutchfield, Ewen, MacKenzie & Peden, Louisville, for appellant.

John A. Fulton, Woodward, Hobson & Fulton, Louisville, for appellee, Progressive Casualty Ins. Co.

William A. Miller, Louisville, for appellee, Theresa Harrison.

Gary M. Weiss, Professor David J. Leibson, University of Louisville School of Law, co-counsel, Louisville, for amicus curiae.

PER CURIAM.

Theresa Harrison was injured and Ronald E. Harrison was killed when their car collided with that of an uninsured motorist. Theresa and Ronald's administratrix, Elizabeth Tinnell, engaged the services of attorney James F. Donoghoe to represent them in their claims against Progressive Casualty Insurance Company, their insurance carrier. Progressive admitted liability under the uninsured-motorist endorsement. Without the knowledge of his clients Donoghoe accepted from Progressive $10,000 in settlement of There-sa's claim and $9,500 in settlement of the administratrix's claim. Separate drafts drawn on Progressive "Payable through the National City Bank of Cleveland," one draft payable to "Theresa A. French Harrison and James F. Donoghoe, Jr., attorney" in the sum of $10,000, and the other payable to "Elizabeth Tinnell, as Administratrix of the estate of Ronald E. Harrison, deceased, and her attorney, James F. Donoghoe, Jr." in the sum of $9,500, were sent to Donoghoe. The limit of the policy was $10,000 for each claim.

Donoghoe without any authority endorsed the names of his clients to the drafts, and on presentment of the drafts to the First National Bank of Louisville he received the amount of $19,500. Donoghoe absconded without making an accounting to his clients.

Theresa and the administratrix instituted suit against Progressive, each plaintiff demanding $10,000. Progressive filed a third-party complaint against First National for indemnity. By a summary judgment the trial court decided that:

(1) The endorsements were forgeries and were not binding on the clients.

(2) The administratrix should recover of Progressive $9,500 with interest from October 10, 1970, with the right of indemnity against First National.

(3) Because Donoghoe's settlement with Progressive for $10,000 on Theresa's claim was for the full amount of the policy, Donoghoe was acting within his authority and further claim of Theresa against Progressive was barred. Theresa was granted permission to sue First National by way of an amended complaint. (Theresa perfected a "protective appeal" against Progressive, which was affirmed by an unpublished opinion decided May 3, 1974.)

(4) Theresa should recover from First National $10,000 with interest from October 10, 1970. (This court granted Theresa's motion for remittitur whereby interest

would begin as of April 22, 1971, the date the draft was received by Donoghoe, rather than October 10, 1970, the date of the accident.)

(5) Because of his fraudulent acts Donoghoe forfeited his claim to attorney fees.

The end result was that First National was adjudged to owe Progressive $9,500 on the third-party complaint and to owe Theresa $10,000 on her amended complaint. First National has appealed.

Theresa's claim against First National was predicated on the theory of conversion as defined in KRS 355.3-419(1). First National contends that it should have been allowed to present evidence, as to both claims, that it acted in good faith and in accordance with reasonable commercial standards, and that such evidence would have absolved it from liability as provided in KRS 355.3-419(3) which reads:

"Subject to the provisions of this chapter concerning restrictive indorsements a representative, including a depository or collecting bank, who has *in good faith and in accordance with the reasonable commercial standards* applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands." (Emphasis added)

It is admitted by all parties that First National acted in the capacity of a collecting bank.

■ Theresa contends, as to her claim, that the trial court did not err in not permitting First National to introduce evidence of its having acted in good faith and in accordance with reasonable commercial standards, since First National did not plead this defense. CR 8.03. We agree.

We are of the opinion that the trial court correctly ruled that there was no genuine issue regarding the liability of First National (the issue of damages will be discussed later) and Theresa was entitled to a judgment as a matter of law. CR 56.03.

■ Progressive does not rely on First National's failure to plead good faith, et cetera. Progressive's counterargument to First National's contention that First National acted in good faith and in accordance with reasonable commercial standards and therefore was absolved from liability under KRS 355.3-419(3) is that the statute is concerned with the "true owner" (the administratrix in this instance) and is not a defense against Progressive which was the drawer-drawee. First National replies by saying that while the statute uses the words "true owner," it was not intended that it be limited to relieving First National only against the *payees*. First National relies on Messeroff v. Kantor, Fla., 261 So.2d 553 (1972), wherein the court held that the collecting banks could successfully rely on a Florida code provision similar to our KRS 355.3-419(3). The facts were quite similar to those in the present case except in one crucial area, namely, Messeroff involved a suit between the payee on the one side and the two collecting banks on the other. The court was not called on to decide whether the defense would have prevailed in a claim by the insurance carrier, which was the drawee. Apparently the precise question has never been decided by a court. Progressive refers to the Uniform Commercial Code, U.L.A., § 3-419(3), Official Comment 6, where it is said:

"The provisions of this section are not intended to eliminate any liability or warranties of presentment and transfer (Section 3-417). Thus a collecting bank might be liable to a drawee bank which had been subject to liability under this section, even though the collecting bank might not be liable directly to the owner of the instrument."

With this authority in mind, we are of the opinion that First National's defense, based

on its having acted in good faith and in accordance with reasonable commercial standards, is unavailing.

On the affirmative side, what is the basis for allowing Progressive to recover from First National? Progressive contends that First National guaranteed all prior endorsements and refers to KRS 355.4–207(1)(a) which provides:

"(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that

"(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; * * *."

We are of the opinion that First National as the collecting bank warranted that it had good title as to Donoghoe's client's interest in the draft, which obviously it did not have.

■ We also are reminded of the equity rule that as between two innocent parties the one who made a loss possible is the one who should suffer. See Akers v. Cushman Construction Company, Inc., Ky., 487 S. W.2d 60 (1972), and Louisville Asphalt Co. v. Cobb, 310 Ky. 126, 220 S.W.2d 110 (1949). First National was in a position to avoid the loss by demanding verification of the endorsements.

■ The remaining problem is whether the recoveries against First National should be reduced by sums representing what would have been Donoghoe's attorney fees collectible from his clients, Mrs. Harrison and the administratrix of her husband's estate, Mrs. Tinnell. In our original opinion deciding these appeals we concluded that they should. After further consideration of the matter on rehearing we are convinced that they should not.

This proceeding began with a complaint in which Mrs. Harrison and the administratrix asserted their separate claims in the amounts of $10,000 each, representing the policy limits, against Progressive under the uninsured-motorist provisions of its insurance policy covering the accident. When it was discovered that Donoghoe had "settled" the cases and made off with the proceeds of its drafts, Progressive asserted a third-party complaint against First National for indemnity. In its answer to that complaint First National pleaded, among other things, that each of the original plaintiffs had a 40% contingent fee contract with Donoghoe and had therefore lost only 60% of the amount otherwise recoverable. In response to an interrogatory Mrs. Harrison admitted that she had such a contract, but said that it pertained only to whatever might be recovered from the other motorist and that there had been no discussion of any claim against her own insurance company. That admission is the only evidence in the record with respect to Donoghoe's fees, and it relates solely to Mrs. Harrison, and not to the administratrix. Hence there is no basis for reducing the Tinnell claim under any theory. Although for some reason not readily apparent the point has never been called to our attention in the briefs, we cannot overlook such an obvious and vital deficiency.

There is still another and more fundamental reason why the recoveries should not be diminished by virtue of Donoghoe's fees, and again it is one that never has been raised or mentioned by any of the parties. It is the fact that Donoghoe did not have any interest in the drafts. They belonged to his clients. This point, which we concede should have occurred to the members of this court (including the writer of this portion of the opinion) at first blush, was first suggested in an amicus curiae brief submitted on the rehearing. Permission to file such a brief was, of course, tacit assurance that new arguments would not be dismissed on the ground that

they had not been made in the original briefs. Otherwise an amicus curiae brief would serve no purpose.

There are two schools of thought as to what policy an appellate court should follow in such instances—which are, we might add, not at all rare. One view is that when a party fails to argue a theory on which he is entitled to win he should simply lose, the courts having enough to do without practicing lawyers' cases. On the other hand, much bad law will go into the books (more, that is, than is there already) if courts confine their analyses of cases to the theories presented in the briefs. It is probable that in well over 50% of the cases coming before it an appellate court will size up the dispositive logic of a controversy differently from the way in which the opposing parties have conceived it. For the sake of the litigants, who have some right, it seems to us, to expect the courts to assume a full share of responsibility for seeing that the controversy is correctly determined, we are of the opinion that insofar as the pleadings, the evidence, the rules of procedure and the principles of law permit, an appellate court should resolve cases on their merits, aided by but not necessarily restricted to the arguments of counsel.

Contingent fee contracts owe their very existence to the principle that the attorney does not gain any share in the title of the thing he has engaged himself to recover. It was the law in England and has been the law in this state from time immemorial that "an agreement to aid in a suit, and then divide the thing recovered" is champertous and void. Rust v. Larue, 14 Ky. (4 Littell) 411, 417, 14 Am.Dec. 172 (1823); Miles v. Collins, 58 Ky. (1 Metc.) 308, 311 (1858); Woods v. White, 253 Ky. 263, 69 S.W.2d 349, 350 (1934). Cf. KRS 372.060. An agreement to measure an attorney's fee by the value of what is recovered is valid only upon the theory that the client "is not to give a part or profit of the thing in contest."

Wilhite v. Roberts, 34 Ky. (4 Dana) 172, 174 (1836). All of this, we realize, is elementary and quite as familiar to respective counsel as it is to us. However, too often simple fundamentals are lost in a game of technicalities. The point here is that Donoghoe's fee arrangement gave him no proprietary interest in the drafts for the reason that the law permits no such arrangement. Call this a fiction, if one will, nevertheless it is the lifeblood of the contingent fee contract.

It is customary for insurance companies, as well as others against whom claims for money are asserted, to make a settlement draft payable to the claimant and his attorney. That is for the protection of the lawyer and for the protection of the payor against a claim by the lawyer that he was dealt around and divested of his lien. It gives him no real ownership interest, since he is not entitled to a fee for money collected until he delivers it over to his client. Only then does the client owe him anything. And it is no answer to say that Donoghoe had a lien on the proceeds of the drafts. The bank had no more of a right to pay him off separately than would Progressive. Again, it is elementary that one who pays another's debt without his knowledge or participation, and without some duty or some interest of his own to protect by so doing, is a volunteer and cannot succeed to the rights of the creditor thus paid. The stubborn fact is that Donoghoe did not have any ownership or other interest in these drafts that would entitle him to collect upon them independently of his clients, who were the owners.

It has been argued that at least Mrs. Harrison and the administratrix would eventually have had to pay Donoghoe, and to that extent their respective losses should not be measured by the gross amounts of the drafts. One answer to that is that we do not know. Perhaps, for example, expenses had been advanced to Donoghoe. Perhaps also the clients could have avoided or raised defenses against the fee con-

tracts. Such possibilities could be tested only if Donoghoe were a party, but are preempted if the bank is allowed the credits here in question. As it is, payment to the plaintiffs in the full amounts of their claims leaves open the question of whether and how much they owe Donoghoe's receiver, a question which can be properly determined only between them. Whatever may be the bank's rights against the receiver is, of course, not before us.

Except as to the voluntary remittitur under which interest runs from April 22, 1971, rather than October 10, 1970, the judgment is affirmed.

All concur.