## GROSBERG v MICHIGAN NATIONAL BANK OAKLAND

Docket No. 69031. Argued January 4, 1984 (Calendar No. 5).—Decided December 28, 1984. Released January 25, 1985.

Merwin K. Grosberg and Sheldon Goldman entered a joint venture to develop, construct, and operate the Chatham Fox Hills Shopping Center. Grosberg supplied the cash resources and Goldman provided management services. As part of his duties, Goldman was to receive rent and other payments relating to the venture and deposit them in Grosberg's account at Manufacturers National Bank. Goldman, without the knowledge or consent of Grosberg, opened an account in both their names with Michigan National Bank Oakland and, during the next 18 months, deposited over $100,000 of the payments from the shopping center venture in that account. All checks were deposited either without indorsement or with indorsements by Goldman for Grosberg, for the center, or for himself. About $44,000 of the funds deposited were used for purposes related to the center; the rest were diverted by Goldman for his own use.

After discovering the existence of the second account, Grosberg dissolved the association with Goldman and made an agreement with Goldman by which the diverted funds would be repaid. Thirteen months after the discovery, Grosberg brought an action in the Oakland Circuit Court against Michigan National Bank Oakland, seeking recovery of the diverted funds on the ground that Michigan National, by allowing the opening of a joint account without joint authority and by accepting checks for deposit without proper indorsement, had converted the funds. The court, Farrell E. Roberts, J., held that Grosberg had no cause of action against the bank because Grosberg and Goldman had entered into a partnership de facto and that Goldman had the authority to deposit partnership checks in an account opened in the names of both partners. The Court of

REFERENCES FOR POINTS IN HEADNOTES
[1, 4, 5] 10 Am Jur 2d, Banks § 631.
[2] 11 Am Jur 2d, Bills and Notes §§ 706, 713, 714.
[3, 4] 60 Am Jur 2d, Partnership § 137.
[4] 11 Am Jur 2d, Bills and Notes § 638.
[5] 10 Am Jur 2d, Banks § 632.

Appeals, D. C. Riley, P.J., and Bashara and MacKenzie, JJ., affirmed in an opinion per curiam, but discounted the partnership relationship, instead relying on the commercial reasonableness of the bank's conduct (Docket No. 49534). The plaintiff appeals.

In an opinion by Justice Boyle, joined by Chief Justice Williams and Justices Ryan, Brickley, and Cavanagh, the Supreme Court *held:*

Goldman had implied authority as a partner to indorse all checks received on behalf of the venture and to deposit the checks in an account maintained in the names of both partners and created in a manner consistent with apparent partnership purposes. Any missing indorsements were properly supplied by the bank.

. 1. In order to establish liability for conversion on the part of a bank such as the defendant, the plaintiff must prove that the instruments in question were paid on a forged indorsement. If forgery be proved, where the bank has dealt with an instrument in good faith and in accordance with reasonable commercial standards, no liability can attach beyond the amount of any proceeds remaining in the bank's control. In this case, the instruments at issue were not paid on forged indorsements and thus the issues of good faith and commercial reasonableness raised by the parties and addressed by the courts below need not be reached.

2. A forged indorsement under the Uniform Commercial Code is a form of unauthorized signature. A signature is not forged if it either is made by an authorized agent or, although unauthorized, is subsequently ratified by the principal or the principal is precluded from denying its validity. In this case, Goldman had implied authority to indorse and deposit checks paid to the center by reason of his status as Grosberg's partner or from the notion of powers that naturally flow from a principal-agent relationship. The possibility that Goldman, at the time of the indorsement, secretly intended to embezzle the funds cannot negate his authority because at that time he was apparently carrying on in the usual way the business of the partnership. This case is distinguishable from the typical corporate embezzlement case in which an employee with no blanket authority to indorse diverts checks in which he has no proprietary interest into a personal account in which the corporate employer has no proprietary interest. Here, Goldman was a partner with general authority to indorse, there was a diversion to a joint account in which Grosberg had a proprietary

interest, and Goldman had a proprietary interest in the diverted checks. In addition the form of the account, joint tenancy with the right of survival, was not so blatantly inconsistent with apparent partnership purposes as to defeat Goldman's implied authority.

Affirmed.

Justice Levin, joined by Justice Kavanagh, dissenting, stated that the bank should be responsible for the plaintiff's loss because it facilitated the misappropriation of the plaintiff's money by Goldman by choosing to rely on Goldman's representation that the plaintiff's signature on the account signature card was genuine. The bank could not have relied on any authority Goldman may have had as the plaintiff's partner, because it obtained such information only after the commencement of the plaintiff's action. But for its decision to open a joint account in reliance on the representation, Goldman would not have been able to misappropriate the money.

113 Mich App 610; 318 NW2d 490 (1982) affirmed.

OPINION OF THE COURT

1. BANKS AND BANKING — CONVERSION — FORGERY — LIMIT OF LIABILITY.

A bank is liable for conversion of funds paid upon presentation of an instrument where indorsement of the instrument is forged; however, where the bank has dealt with the instrument in good faith and in accordance with reasonable commercial standards, no liability can attach beyond the amount of any proceeds from the instrument remaining in the bank's control (MCL 440.3419[1], [3]; MSA 19.3419[1], [3]).

2. BANKS AND BANKING — INDORSEMENT — FORGERY.

An indorsement of a check by someone other than a principal is not forged if it is made by an authorized agent or, although unauthorized, is subsequently ratified by the principal (MCL 440.1201[43], 440.3404[1]; MSA 19.1201[43], 19.3404[1]).

3. PARTNERSHIP — IMPLIED AUTHORITY — INDORSEMENT.

A partner who had implied authority to indorse checks payable to his partner or to a business venture undertaken by the partnership in which he had a proprietary interest, and to deposit the checks in his partner's bank account by virtue of his status as a partner, had implied authority to deposit the checks in another partnership account opened in a different bank without the knowledge of his partner even though he intended to use the second account to divert the funds for his own use.

4. BANKS AND BANKING — PARTNERSHIP — IMPLIED AUTHORITY —
INDORSEMENT — CONVERSION.

 A bank was not liable for conversion where it accepted for deposit
in a partnership account checks 1) payable to one partner or to
a business venture undertaken by the partnership that were
indorsed by another partner who had a proprietary interest in
the checks or 2) that lacked an indorsement, but which the
bank supplied according to law, where the authority of the
second partner to indorse and deposit was implied and the
account was created in a manner consistent with apparent
partnership purposes.

DISSENTING OPINION BY LEVIN, J.

5. BANKS AND BANKING — CONVERSION — INDORSEMENT — FORGERY.

 *A bank should be liable for the misappropriation of funds paid
upon presentation of an instrument where the indorsement was
forged and the bank facilitated the misappropriation by open-
ing a joint account in the name of the payee of the instrument
and the forger in reliance on representations by the forger that
the payee's signature on an account signature card was genu-
ine.*

**Smith, Magnusson, Chartrand & Adkison, P.C.
(by *Herbert O. Magnusson* and *Phillip G. Adkison),*
for the plaintiff.**

**Milmet, Vecchio, Ward & Carnago, P.C. (by
*George E. Ward),* for the defendant**

BOYLE, J. This appeal involves an unusual ad-
mixture of partnership law in a case otherwise
governed by Uniform Commercial Code principles.
Although both courts below absolved defendant
Michigan National Bank-Oakland of any liability
to plaintiff Merwin K. Grosberg for conversion, the
trial court reached its decision relying heavily on
partnership principles, while the Court of Appeals
focused instead on the commercial reasonableness
of the bank's conduct under the UCC. We find the
partnership aspects to be controlling in this case
and so affirm on that ground.

# I

As developed below, plaintiff Grosberg became associated with Sheldon Goldman in several business ventures during the early 1970's. In particular, Grosberg and Goldman were involved in the development, construction, and operation of the Chatham Fox Hills Shopping Center, with Grosberg supplying the necessary cash resources to fund the project and Goldman providing his management services. Goldman's responsibilities included soliciting tenants, negotiating commercial leases, entering into subcontracts, and supervising the construction of the shopping center. In addition, Goldman was to receive incoming checks (representing rent and other payments) and deposit them in an account maintained by Grosberg at a bank (Manufacturers National Bank) other than defendant. To that end, Grosberg executed a power of attorney at Manufacturers, authorizing Goldman to indorse and deposit checks payable to Grosberg and to withdraw funds from that account.

Subsequently, Goldman, without the knowledge or permission of Grosberg, opened an account in both their names with the defendant bank, signing Grosberg's name to the signature card along with his own. Over the next 18 months, Goldman deposited in that account over $100,000 in checks relating to the shopping center enterprise. The checks were variously made out to Grosberg, Grosberg doing business as Chatham Fox Hills Shopping Center, Chatham Fox Hills Shopping Center, and Goldman. On some of the checks, Goldman provided no indorsement, while on others he indorsed them by signing for Grosberg, Chatham Fox Hills Shopping Center, or himself, according to the payee named. Approximately $44,000 of the funds

deposited in the account were subsequently paid out by Goldman for shopping center purposes; the balance of the funds were apparently diverted for Goldman's own uses.[1]

In May, 1975, Grosberg fortuitously discovered the diversion of funds when he stumbled upon an account statement while searching for papers in Goldman's desk. Grosberg immediately ordered the account frozen pending his further investigation of the embezzlement. The relationship deteriorated, and, in July, 1975, the two executed a memorandum formally reciting the dissolution of their association and providing for the appraisal and application of certain of Goldman's assets to offset the amount of wrongfully diverted funds, then estimated to be $86,000. Following an independent appraisal of their joint business assets, Grosberg and Goldman, in December, 1975, executed a memorandum of understanding that incorporated a complete accounting of all of Goldman's defalcations, including the diversion of funds to defendant bank, and set forth a series of undertakings by Goldman to satisfy his obligation to repay Grosberg. Deducted from the diverted funds were the $44,000 in disbursements paid out by Goldman from that account for proper business purposes. As part of their agreement, Goldman gave Grosberg a security interest in all his home furnishings and assigned him a portion of the wages to be paid by Goldman's new employer. There is no indication in the record before this Court that Goldman has not continued to honor his obligations to make restitution under that agreement.

Six months after executing the restitution agreement, Grosberg commenced the instant action against defendant Michigan National Bank, seek-

---

[1] The account contained a little over $1,000 when Grosberg discovered the diversion and ordered the account frozen.

ing recovery for the bank's alleged conversion of the $112,000 in checks belonging to Grosberg and the shopping center enterprise deposited by Goldman in the joint account. In a decision following a bench trial, Oakland Circuit Judge Farrell E. Roberts found that a de facto partnership had been created between Grosberg and Goldman and that, as a result, Goldman had authority to deposit partnership checks in the account opened in both their names at the defendant bank.

In affirming, the Court of Appeals agreed with the bank that the finding of partnership by the trial judge was not clearly erroneous, but found that because "no partnership purpose was involved in Goldman's disposal of the negotiable instruments at issue here, defendant could not rely on Goldman's *actual* authority," *Grosberg v Michigan National Bank Oakland,* 113 Mich App 610, 617; 318 NW2d 490 (1982) (emphasis added), and, further, that because the defendant bank had no knowledge of the partnership, "defendant could hardly rely on any *apparent* authority of Goldman as a partner." *Id.,* p 616 (emphasis added). Thus, the Court of Appeals discounted the partnership relationship and instead relied upon the commercial reasonableness of the bank's conduct, under Michigan UCC provisions MCL 440.3419; MSA 19.3419 and MCL 440.4205(1); MSA 19.4205(1), in supplying missing indorsements and accepting the checks for deposit. In closing, the Court observed that the only forgery in the case was that of Grosberg's signature on the signature card, as to which the trial court's finding of commercial reasonableness had not been challenged by Grosberg on appeal. *Id.,* p 619.

Grosberg appeals, challenging the findings below of commercial reasonableness as to both the opening of the account and the acceptance of deposit

items payable to Grosberg and the shopping center without proper indorsements.

## II

In order to establish liability for conversion on the part of defendant bank, Grosberg is required to prove that the instruments at issue were "paid on a forged indorsement." MCL 440.3419(1); MSA 19.3419(1). Even if such a showing is made, no liability "beyond the amount of any proceeds remaining in [the bank's] hands" can attach where the bank has dealt with an instrument "in good faith and in accordance with the reasonable commercial standards applicable to the business of such [bank]." MCL 440.3419(3); MSA 19.3419(3). Because we find that the instruments here at issue were not in fact "paid on a forged indorsement," we need not reach the issues of good faith and commercial reasonableness addressed by the courts below and raised by the parties on appeal.

A forged indorsement under the UCC is a form of "unauthorized signature," MCL 440.1201(43); MSA 19.1201(43) and MCL 440.3404, Comment 1; MSA 19.3404, Comment 1, which is treated as "wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." MCL 440.3404(1); MSA 19.3404(1). It follows that a signature or indorsement that is *authorized* is not a forgery under the code. MCL 440.3403(1); MSA 19.3403(1). Under these provisions, then, an indorsement is not forged if either it is made by an authorized agent or, even though unauthorized, the signature is subsequently ratified by the principal or the principal is precluded from denying its validity. The instant case contains enough elements of authority to dispose of plaintiff's conversion claim at the outset.

*Goldman's Authority to Indorse and Deposit Checks*

We accept as given the trial court's finding that Goldman had *actual* authority to indorse and deposit incoming checks only in the account maintained by Grosberg at Manufacturers National Bank, and not in the account opened by Goldman at defendant bank. Unchallenged on appeal, however, is the further finding that Grosberg and Goldman were partners in the shopping center enterprise. We depart from the analysis applied by the Court of Appeals, which discounted the significance of the partnership, and find that Goldman's partner status invested him with *implied* authority to indorse and deposit each of the incoming checks in the account at defendant bank.

We begin with the principle, long established in this state, that a partner has implied authority to indorse checks made payable to the partnership. See *Kaufman v State Savings Bank,* 151 Mich 65, 68; 114 NW 863 (1908); *First National Bank of Negaunee v Freeman,* 47 Mich 408, 411; 11 NW 219 (1882); *Link v First National Bank of Chicago,* 312 Ill App 502, 510; 38 NE2d 815 (1942); see also *Lentz v United States,* 346 F2d 570 (C Cl, 1965); Anno: *Bank's Liability to Nonsigning Payee,* 47 ALR3d 537, 548. This principle is reinforced in § 9 of the Uniform Partnership Act, as enacted in this state:

"[T]he act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." MCL 449.9(1); MSA 20.9(1).

In analyzing the provision quoted above, the Court of Appeals concluded that the section was inapplicable because the bank, having no knowledge of the existence of a partnership, "could hardly rely on any *apparent* authority of Goldman as a partner." 113 Mich App 616 (emphasis added). That conclusion misconstrues the provision, however, which we interpret to be broad enough to encompass the usual definition of *implied,* as well as *apparent,* authority. While the latter term defines powers "arising from and in accordance with the [principal's] manifestations to * * * third persons," 1 Restatement Agency, 2d, § 8, p 30, the former term relates to powers "implied or inferred from the [express] words used, from customs and from the relations of the parties [principal and agent]." *Id.,* § 7, comment c, p 29. The Uniform Partnership Act phrase "for apparently carrying on in the usual way the business of the partnership," although it contains the word "apparent," need not be read to exclude the implied-authority notion of powers *that naturally flow from the principal-agent relationship* (in this case, the partnership).[2] Accordingly, we find that § 9 of the Uniform Partnership Act applies *regardless* of the bank's lack of knowledge of the partnership relationship, and that any act of Goldman within the scope of his implied authority as a partner necessarily bound his co-partner Grosberg under that provision.[3]

---

[2] See *Burns v Gonzalez,* 439 SW2d 128 (Tex Civ App, 1969) (finding insufficient evidentiary basis for partner authority), for a discussion of the Texas counterpart to MCL 449.9(1); MSA 20.9(1), in which the court alluded to principles of both implied and apparent authority.

Our interpretation of MCL 449.9(1); MSA 20.9(1) to encompass implied authority is strengthened by the fact that no other provision of the Uniform Partnership Act specifically incorporates the common-law principle of implied authority into that statute. See MCL 449.1 *et seq.;* MSA 20.1 *et seq.*

[3] The Restatement of Agency, 2d, also recognizes another category

As developed at trial, Grosberg had executed a power of attorney expressly authorizing Goldman to indorse and deposit Grosberg's checks in the Manufacturers account. In addition, Grosberg entrusted Goldman with responsibility for the receipt and disposition of incoming shopping center checks.[4]

In light of the partnership relationship, we easily conclude that Goldman had *implied* authority to indorse all incoming checks on behalf of Grosberg, Grosberg doing business as Chatham Fox Hills Shopping Center, and Chatham Fox Hills Shopping Center. The possibility that Goldman may have secretly intended at the time of indorsement to embezzle the funds cannot detract from his authority to affix indorsements, since at that time he was "apparently carrying on in the usual way the business of the partnership." MCL 449.9(1); MSA 20.9(1). Thus, as to the mere act of indorsement, we hold that Goldman was properly authorized to affix appropriate signatures on behalf of Grosberg and the shopping center.

Having determined that Goldman was autho-

of authority, "inherent agency power," defined as "the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." 1 Restatement Agency, 2d, § 8A, p 36. The comment on that section includes within the scope of inherent agency power the situation "in which a general agent does something similar to what he is authorized to do, but in violation of orders." Comment b, p 38. To the extent the following textual discussion focuses on authority derived from the partnership relation, as distinct from Grosberg's manifestations, we incorporate the notion of "inherent agency power" into our view of implied authority.

[4] On cross-examination, Grosberg testified that even though no bank account was captioned in the shopping center name, he expected checks payable to "Chatham Fox Hills Shopping Center" to be deposited to the Manufacturers account. Since Goldman's power of attorney made no reference to instruments payable to the shopping center entity, it appears that Goldman's *actual* authority may well have exceeded the authority recited in the power of attorney.

rized to indorse the checks at issue, the question remains whether Goldman's subsequent conduct in depositing the checks in the account at defendant bank somehow vitiated that authority, so as to trigger the bank's conversion liability under the Uniform Commercial Code. Where corporations are involved, we recognize that authority to deposit checks payable to corporate payees into individual accounts cannot normally be implied, and that a bank accepting such checks does so at its peril. See, *e.g.*, *Sherriff-Goslin Co v Cawood,* 91 Mich App 204; 283 NW2d 691 (1979); *Aetna Casualty & Surety Co v Hepler State Bank,* 6 Kan App 2d 543; 630 P2d 721 (1981). As stated by the court in *Aetna Casualty,* p 549: " 'Any bank or person who receives a check on the indorsement of such an agent assumes the risk of the agent's authority.' "[5]

While we adhere to the foregoing principle, we find the corporate cases to be distinguishable on several grounds from the situation at hand. First, in the former cases, it is uniformly established that the embezzling employee had no authority, express or implied, to *indorse* on behalf of the corporate employer.[6] Absent such authority to indorse the checks in the first place, obviously there could be no authority to then deposit the checks into the employee's personal account.

Second, in the corporate cases, the diverted checks were deposited in the embezzler's *individual* account, in which the corporate employer had

---

[5] Quoting from Brady on Checks (5th ed), § 23.17, pp 23-39.

[6] See, *e.g.*, *Sherriff-Goslin, supra,* 91 Mich App 206; *Aetna Casualty, supra; Womack Machine Supply Co v Fannin Bank,* 499 SW2d 917, 918 (Tex Civ App, 1973), *rev'd on other grounds* 504 SW2d 827 (Tex, 1974).

Unlike implied authority in the partnership context, no authority to indorse corporate instruments is implied in corporate employees. See Brady on Checks (5th ed), § 23.17, pp 23-38.

no proprietary interest whatsoever. Thus, a complete separation of ownership and possession occurred such as to raise a red flag in the mind of a reasonable depositary bank teller.[7]

Finally, the corporate cases involve the diversion of checks in which the embezzler had no ownership interest or objective claim of right. This factor reinforces the inference of irregularity and negates the possibility of implied authority.

In sum, the typical corporate embezzlement case involves an employee with no blanket authority to indorse, a diversion to a personal account in which the corporate employer has no proprietary interest, and diverted checks in which the embezzler has no proprietary interest. By contrast, the instant case involves a partner with general authority to indorse, a diversion to a joint account in which the complaining payee had an equal proprietary interest, and diverted checks in which the embezzler (Goldman) had a partial proprietary interest. Taken as a whole, the present circumstances are not so inconsistent with "carrying on in the usual way the business of the partnership" that Goldman's authority to make the deposits at issue cannot be implied under MCL 449.9(1); MSA 20.9(1). Rather, we find that Goldman's inherent authority as a partner extended by implication to the deposit of partnership checks in an account ostensibly maintained in both partners' names.

In challenging the commercial reasonableness of the bank's conduct in accepting the checks for deposit, plaintiff contends that the form of the account—joint tenancy with full right of suvivorship—was inappropriate for the deposit of business

_____

[7] The instant case is distinguishable from *McIntosh v Detroit Savings Bank*, 247 Mich 10; 225 NW 628 (1929), in which the deposit of partnership checks into a partner's *individual* account was held to constitute notice of the misappropriation.

checks and thus should have given the bank notice of Goldman's misconduct. Although we need not reach the commercial reasonableness issue because we rest our decision on partnership grounds, we note in passing that the form of the account is less significant to our analysis than the fact that the account was captioned in both partners' names. For example, while a bank might reasonably believe the joint tenancy format to be an expedient interim arrangement pending the formalization of a partnership, it is difficult to conceive of a situation where a bank could reasonably believe that an individual account is the authorized format for a partnership account.

To the extent that the form of the account also bears on the issue of Goldman's implied authority, we find the joint format to be not so blatantly inconsistent with "apparent partnership purposes" as to defeat the implication of Goldman's authority under the other factors discussed above.[8] Moreover, since Goldman apparently was authorized to deposit checks payable to the shopping center entity into Grosberg's *individual* account at Manufacturers, we also reject the argument that Goldman lacked authority to deposit such business checks to an individual account captioned in both their names.

Finally, as to the checks on which Goldman provided no indorsement, we agree with the rulings of both courts below that the defendant bank properly supplied the missing indorsements pursuant to MCL 440.4205(1); MSA 19.4205(1).[9] Apart

[8] Although plaintiff also challenges the commercial reasonableness of the bank's conduct in allowing the joint account to be opened by only one signer, we agree with the Court of Appeals that the issue has not been preserved on appeal. See 113 Mich App 619.

[9] The section provides:

"A depositary bank which has taken an item for collection may

from the missing indorsement, we apply to those checks the identical analysis set forth above to conclude that Goldman had implied authority to deposit them in the joint account.

To summarize, Grosberg's conversion claim requires proof that Goldman forged the indorsements on the deposited checks. Because of Goldman's implied authority both to indorse incoming checks and to deposit them in an account created in a manner consistent with "apparent partnership purposes," however, we conclude that no forgery occurred. Under this unusual set of facts, therefore, the defendant bank is free from liability in conversion.

## III

In conclusion, we stress the limited reach of today's holding, which depends so much on the unusual facts presented and the unique principles applicable to partnerships. By no means should our holding be interpreted to give free rein to the banking industry to ignore facial irregularities in items received for deposit. Nor do we approve of a procedure that permits an account to be opened, and checks deposited into it, in the absence of the authority of a joint owner of the account. While those practices are not per se unreasonable, we note that any bank following such procedures does so at its peril. The defendant bank prevails here only because it took the risk of Goldman's authority and won, not because its conduct was necessar-

---

supply any indorsement of the customer which is necessary to title unless the item contains the words 'payee's indorsement required' or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement."

ily acceptable or reasonable.[10] Under these specific circumstances, while we agree with the equitable principle that "as between two innocent parties the one who made a loss possible is the one who should suffer,"[11] on balance, it is Grosberg and not the bank who is less innocent and who must bear the burden of his misplaced trust.

Affirmed.

WILLIAMS, C.J., and RYAN, BRICKLEY, and CAVANAGH, JJ., concurred with BOYLE, J.

LEVIN, J. The defendant, Michigan National Bank-Oakland, opened a joint checking account in the names of Sheldon Goldman and plaintiff Merwin K. Grosberg. Goldman forged Grosberg's signature on the signature cards. Goldman then deposited to the joint account checks made out to Grosberg, Grosberg doing business as Chatham Fox Hills Shopping Center, Chatham Fox Hills Shopping Center, or Goldman. Over a period of 18 months, over $100,000 was deposited to the joint account. Approximately $44,000 was paid out of the account for purposes of Chatham Fox Hills Shopping Center and the balance was diverted by Goldman for his own uses.

The trial judge found that Grosberg and Goldman were partners[1] in Chatham Fox Hills Shop-

---

[10] While it appears that plaintiff may have included a negligence claim in his complaint, we decide this case addressing the conversion claim which has been the only theory of recovery briefed and argued on appeal. The "commercial reasonableness" issue raised by plaintiff relates solely to the *defense* to conversion liability provided by MCL 440.3419(3); MSA 19.3419(3). Accordingly, we do not address the possibility of *negligence* liability under these or similar circumstances.

[11] *First National Bank of Louisville v Progressive Casualty Ins Co*, 517 SW2d 226, 229 (Ky, 1974).

[1] The trial judge said that the partnership tax returns filed and tax losses taken by Grosberg and Goldman were "certainly highly pre-

ping Center and dismissed Grosberg's complaint. The Court of Appeals affirmed.[2] This Court affirms the Court of Appeals on the ground that Goldman, as a partner, had the authority to indorse checks representing partnership funds and deposit them to the joint account.

The opinion of the Court elides Grosberg's claim that the bank is responsible for the defalcation because it opened a joint account in Grosberg's and Goldman's names on the basis of Goldman's false representation that one of the signatures on the signature cards was Grosberg's.

The bank could not properly open a checking account in Grosberg's name without his authority. Nor could it properly open a checking account in Grosberg's and Goldman's joint names without Grosberg's authorization. A bank officer acknowledged that the bank would not have opened an account in a partnership name without the signatures of both partners. In opening the joint Grosberg-Goldman checking account, the bank chose to rely on Goldman's representation that the signature on the signature cards purporting to be Grosberg's signature was in fact his signature, rather

---

sumptive evidence that a partnership existed." The filing of partnership tax returns is, however, an entirely neutral factor in determining whether there is a partnership. The Internal Revenue Code defines "partnership" to include a "syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate." 26 USC 761(a). Thus "[t]he term 'partnership' is broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships." 26 CFR 1.761-1(a). Relationships involving cotenants, employers and employees and independent contractors, and debtors and creditors have been considered partnerships for tax purposes. See 1 Willis, Pennell & Postlewaite, Partnership Taxation (3d ed), §§ 3.02, 3.05, 3.07.

[2] *Grosberg v Michigan National Bank Oakland,* 113 Mich App 610; 318 NW2d 490 (1982).

than requiring that Grosberg sign in the presence of a bank officer.[3]

If the bank had not relied on Goldman's representation of the validity of Grosberg's signature in opening the joint account, Goldman could not have indorsed and deposited funds belonging to Chatham Fox Hills Shopping Center and Grosberg to the joint account and withdrawn funds from that

---

[3] Grosberg alleged in his complaint that the bank's failure to properly authenticate the signature card was in derogation of reasonable commercial standards and demonstrated a lack of due care and diligence. The Uniform Commercial Code does not relieve a bank of its common-law duty to exercise ordinary care. *Bank of Southern Maryland v Robertson's Crab House, Inc,* 39 Md App 707; 389 A2d 388 (1978); 6 Anderson, Uniform Commercial Code (3d ed), § 4-103:9.

A third person taking commercial paper indorsed by an agent acts at his peril that the principal will be bound by the transaction. 6 Anderson, *supra,* § 3-404:6. A bank is negligent when it relies on the instructions of a purported agent without confirming his authority. *Taylor v Equitable Trust Co,* 269 Md 149; 304 A2d 838 (1973).

The Court holds that Goldman had implied authority to indorse and deposit partnership checks into the joint account, but acknowledges that the bank had no knowledge of the partnership relationship. If, however, the Grosberg-Goldman relationship was in fact a partnership, the bank has acted without confirming Goldman's authority, let alone the existence of the partnership.

The checks deposited into the joint account were payable to Grosberg, Grosberg doing business as Chatham Fox Hills Shopping Center, Chatham Fox Hills Shopping Center, or Goldman. The Court finds it unnecessary to determine if *accepting such checks for deposit into a joint account* was commercially reasonable because the Court rests its decision on partnership grounds. The commercial reasonableness issue, however, should be reached. That a partner may have the authority to conduct banking transactions on behalf of his copartners does not necessarily relieve a bank of its duty to act with commercial reasonableness and ordinary care in confirming that authority.

We recognize that banks often choose not to confirm authority and authenticity in every transaction and that making such choices may even be good business practice. The question, however, is not whether the bank's overall policy is wise from a business standpoint, but, rather, whether it has acted with reasonable care in its dealings with the particular customer. The bank may establish as many or as few safeguards in dealing with customers as it desires—that is a business judgment. But since the bank is generally in the best position to guard against forgery, and is also in the best position to insure and spread costs, it generally should bear the risk of loss. See Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts,* 70 Yale L J 499, 549-551 (1961).

account for his personal purposes. Thus, but for the bank's decision to open the joint account in reliance on Goldman's representation, Goldman would not have been able to so misappropriate monies belonging to Chatham Fox Hills Shopping Center and Grosberg.

The bank, having facilitated the misappropriation of the money by choosing to rely on Goldman's representation in opening the joint account, is responsible for the resulting loss.[4]

The Grosberg-Goldman joint account cannot properly be characterized a partnership account either on the ground that it was a joint account and Grosberg and Goldman were partners or on the ground that partnership money was deposited in the account under the circumstances that the account was opened on forged papers that the bank chose to rely on and that Grosberg was unaware of the joint account and did not authorize that it be opened. Grosberg's name on the joint

---

[4] The bank cannot avoid responsibility for the loss by relying on its right to supply missing indorsements where it has failed to exercise ordinary care in *opening* the account; similarly, that the bank has allowed withdrawals on signatures matching those on the signature card is irrelevant where the signature card itself was accepted under circumstances amounting to negligence. *Bullis v Security Pacific Nat'l Bank,* 21 Cal 3d 801; 148 Cal Rptr 22; 582 P2d 109 (1978).

In *Bullis,* an estate co-executor opened a checking account for estate purposes. Bank policy required two signatures for withdrawals from the account, but the bank officer who opened the account failed to note this on the signature card. The co-executor subsequently misappropriated almost $250,000 with checks bearing only his signature. The Supreme Court of California held that the bank had breached its duty of care and was responsible in damages to the heirs of the estate.

In the instant case, the record shows that the bank would not have opened an account in a partnership name without requiring documentation of Goldman's authority to act on behalf of the "partnership."

The decision of the Court absolves the bank from legal liability for failure to follow its own policy and what is well known to be general banking industry practice. It is odd that the bank is relieved of liability on the basis of a finding that Grosberg and Goldman were partners although the account was not styled "partnership" but rather "joint with right of survivorship."

account added nothing; for all practical purposes, the "joint account" was Goldman's personal account.

In opening the Grosberg-Goldman joint account in reliance on Goldman's representation of the validity of Grosberg's signature, the bank did not rely on any authority Goldman may have had as Grosberg's "partner;" only after the commencement of this litigation did the bank's lawyer obtain information that is the foundation of the Court's decision today. To the extent that today's decision rests on the dubious finding that Goldman was more than an ordinary agent, servant, or employee entrusted with the authority to make deposits, but was a partner, the result is adventitious.

The opinion of the Court in effect relieves a bank from liability for allowing a partner to:

(i) open a joint bank account in the names of himself and his partners, or a partnership account, by forging the signatures of all the partners, either as joint signatories on a joint account or on papers authorizing the opening of a partnership account, *and*

(ii) deposit partnership money in the account, *and*

(iii) withdraw the funds on his own signature, thereby transforming partnership money into the personal funds of the dishonest partner.

If this can be done with partnership money, it might also be done by a dishonest co-trustee with trust money. The dishonest co-trustee opens a joint account in the names of himself and the other trustees, or a trust account, forging whatever signatures on signature cards or other papers are needed to open the account. The dishonest co-trustee, according to the rationale of the opinion of the Court, is authorized, as a co-trustee, to indorse and deposit trust money into the account. A joint

account is a trust account either because all the co-trustees are joint signatories (albeit on forged signatures) or because trust money has been deposited to the account. The bank is protected because the dishonest co-trustee had the authority to indorse and deposit the checks. Trust money, like partnership money, would thus be transformed into the personal funds of the dishonest person without any responsibility on the part of the bank.

The opinion of the Court states that it does not approve of a bank opening a bank account "in the absence of the authority of a joint owner of the account" and that a bank that does so acts "at its peril." This bank did so and yet prevails because the Court concludes that Goldman had the authority to indorse and deposit checks to a partnership account and the Court characterizes the joint account as a partnership account although it was labeled a joint account, the bank did not know that it was a partnership account—if it was, and Grosberg's signature on the signature card was forged. Under the Court's analysis, the dishonest partner will always have the authority to indorse and deposit partnership checks to such a "partnership account" and the bank will never be at peril.

The Court adds that although the bank made the loss possible, Grosberg "is less innocent" than the bank and must therefore "bear the burden of the misplaced trust." The Court does not state why Grosberg is less innocent than the bank. If it is because Grosberg allowed Goldman to receive and make deposits of checks payable to Grosberg or Chatham Fox Hills Shopping Center, then a bank will not be at peril if it allows any ordinary agent, servant, or employee, authorized by the payee to make deposits, to open a joint bank account with forged signature cards. If it is because Grosberg gave Goldman a power of attorney (of which the

bank was not aware) on another bank account with a different bank, then, without regard to the terms of the power of attorney, a person who signs a power of attorney is at his peril, not the bank.

I would reverse and remand for further proceedings consistent with this opinion.

Kavanagh, J., concurred with Levin, J.